**NOFELCO REALTY CORP., Plaintiff,**

v.

**UNITED STATES of America: Clifford L. Alexander, Jr., Secretary, Department of the Army; Lt. General John W. Morris, Chief of Engineers, Army Corps of Engineers; Army Corps of Engineers: Col. W. M. Smith, Jr., District Engineer, New York District, Army Corps of Engineers; Maj. Gen. J. Johnson, North Atlantic Division Engineer, Defendants.**

No. 81 Civ. 0052 (GLG).

United States District Court,
S. D. New York.

Sept. 11, 1981.

Denham & Vaneria, New York City, for plaintiff; Robert E. Denham, of counsel.

John S. Martin, Jr., U. S. Atty. for the S. D. New York, New York City, for defendants; Richard N. Papper, Asst. U. S. Atty., New York City, of counsel.

## MEMORANDUM DECISION

GOETTEL, District Judge.

This action was brought by the plaintiff, Nofelco Realty Corp. ("Nofelco"), seeking judicial review of the action of the Secretary of the Army, through the Army Corps of Engineers ("Corps"), in denying the plaintiff's application for a permit to construct a bulkhead along the shoreline of its property. The action initially came before this Court on a motion for a preliminary injunction—a rather unusual posture for such a case.

Nofelco owns a piece of tidal property, 100 feet wide and 84 feet deep, in Queens, adjacent to Shellbank Basin, which is a waterway flowing into Jamaica Bay. When Nofelco originally bought the property in 1959, only a strip 10 feet deep was dry land. Nofelco gradually filled in the submerged area, and now the property is dry land to a depth of approximately 72 feet, with another 12 feet of embankment area. The northern 30 feet of the shoreline are occupied by a building owned by Nofelco extending out over the water on stilts.[1]

In August 1977, Nofelco applied to the Corps for a permit to build a sloping riprap bulkhead at the shore edge and to fill in the property landward of the bulkhead and also to erect vertical steel sheet pile bulkheading to secure the side boundary of the property at one corner of the shore edge. The Corps granted the permit in April 1978.

In October 1978, Nofelco applied for permission to run the steel sheet bulkhead, which would rise approximately 6 feet above the mean high water level, along the remaining shore edge of the property. The initial review of Nofelco's application was by the District Engineer of the Corps, who recommended in July 1979 that a permit be issued, despite the objections of the National Marine Fisheries Service and the Fish and Wildlife Service. The Division Engineer, superior to the District Engineer, rejected the recommendation and directed the District Engineer to deny the permit, which he did in May 1980, on the ground that the proposed bulkhead "would increase encroachment upon this heavily stressed waterway for an apparently non-water dependent activity" and was "not in the public interest." While rejecting Nofelco's proposal, the notification letter indicated that the Corps would be willing to issue a permit for a similar bulkhead 8.5 feet landward of the location proposed by Nofelco.[2]

Nofelco then retained an environmental consultant, who wrote to the Corps on be-

half of the plaintiff. Nofelco subsequently requested an adjudicatory hearing, which was denied on the ground that the denial of the permit was the final administrative action, from which no administrative appeal was permitted. Consequently, Nofelco filed the instant action, seeking review of the administrative action and seeking a preliminary injunction against any action by the Corps to remove the parts of the steel bulkhead that were already constructed.

Nofelco asked for injunctive relief because the letter it received from the Corps had referred to allegedly unauthorized construction at the shore edge of its property, leading Nofelco to fear the institution of Corps action to require the removal of that construction. This Court denied the motion for a preliminary injunction in January 1981 on the ground that there was no immediate threat of irreparable harm, since no steps had yet been taken to require removal of the allegedly unauthorized construction. There has still been no enforcement action brought against Nofelco; consequently, there is still no need for a preliminary injunction, and the plaintiff's renewed application for it is denied.

Nofelco has also asked for a trial de novo on the merits, on the ground that the procedures by which the Corps denied Nofelco's October 1978 application violated due process and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq. For the reasons set forth below, this Court has determined that the plaintiff is not entitled to a trial de novo, but rather that the final administrative action taken by the Corps should be reviewed on the basis of the administrative record.

Two statutes govern the permit program under which the plaintiff made its application—section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and section 404 of the Federal Water Pollution Control Act,

1. Nofelco's building is adjacent to a Fire Department building, which extends the same distance into the channel. Adjacent to the southern boundary of Nofelco's property is a marina, which extends well into the channel.

2. A bulkhead 8.5 feet back would apparently be at the original mean high water line.

33 U.S.C. § 1344 (as added in 1972 and amended in 1977). Issuing permits to build such structures as bulkheads in navigable waters of the United States has long been the responsibility of the Secretary of the Army and the Chief of Engineers. *See* 33 U.S.C. § 403; 33 C.F.R. § 320.2(b) (1980). The regulations governing the issuance of such permits are found in 33 C.F.R. §§ 325.1 *et seq.* (1980) and provide for, *inter alia,* public notice of the permit application, receipt of written comments from interested parties, an opportunity for the applicant to rebut all substantive adverse comments, a public hearing if the district engineer determines that one is needed or if one is requested,[3] preparation of findings of fact by the district engineer, and written notification to the applicant of a denial and the reasons for it. The responsibility of issuing permits for dredged or fill material under section 1344 was also given to the Secretary of the Army and the Chief of Engineers. *See* 33 U.S.C. § 1344(a), (d); 33 C.F.R. § 320.2(g) (1980). The regulations governing the issuance of those permits are found in 33 C.F.R. §§ 325.1 *et seq.* (1980) and are essentially the same as those for section 403 permits. *See* 40 C.F.R. § 124.1(a) (1980).

The plaintiff has not alleged that the defendants failed to follow the Corps procedures outlined above. Instead, the plaintiff argues that those procedures are inadequate under the standards of the APA and under the due process standard. The plaintiff complains particularly about the failure of the Corps to conduct a formal adjudicatory hearing, as provided for in the APA for adjudications "required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a).

■ The challenged Corps procedures, however, have been upheld, at least in cases involving permits under section 403 (the Rivers and Harbors Act permit provision). For example, the court in *Taylor v. District Engineer,* 567 F.2d 1332 (5th Cir. 1978), held that the Corps procedures are not governed by the standards of the APA for formal adjudicatory hearings, *id.* at 1336–37, and that the Corps procedures "easily satisfy the requirements of due process." *Id.* at 1338. *Accord, Joseph G. Moretti, Inc. v. Hoffman,* 526 F.2d 1311 (5th Cir. 1976). Moreover, it is clear from decisions in cases involving statutes other than the Rivers and Harbors Act that the APA does not require formal, trial-type hearings in all adjudications. *See United States v. Independent Bulk Transport, Inc.,* 480 F.Supp. 474, 478–79 (S.D.N.Y.1979), and the cases cited therein.

Nevertheless, the plaintiff argues that a formal adjudicatory hearing was required in the instant case, because the permit program under which it applied is governed by section 1344 (the Federal Water Pollution Control Act permit provision) as well as by section 403, and because courts have held another section of the Federal Water Pollution Control Act to require formal adjudicatory hearings. The cases the plaintiff cites are *Seacoast Anti-Pollution League v. Costle,* 572 F.2d 872 (1st Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978); *Marathon Oil Co. v. Environmental Protection Agency,* 564 F.2d 1253 (9th Cir. 1977); and *United States Steel Corp. v. Train,* 556 F.2d 822 (7th Cir. 1977), all of which con-

---

**3.** For a section 403 application, the district engineer has discretion to refuse to hold a requested public hearing if he determines that there is insufficient "public interest" to justify holding a hearing. *See* 33 C.F.R. § 327.4(b) (1980). In contrast, for a section 1344 application, the district engineer appears to have somewhat less discretion to refuse to hold a requested public hearing. In such a situation, he is directed to hold the hearing unless he "determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." *See id.* § 327.4(c).

The defendants assert that since the plaintiff did not request a hearing until the procedure was already completed, it had waived whatever right it had to a hearing. *See Costle v. Pacific Legal Foundation,* 445 U.S. 198, 214–15, 100 S.Ct. 1095, 1105, 63 L.Ed.2d 329 (1980); *Gables by the Sea, Inc. v. Lee,* 365 F.Supp. 826, 826 (S.D.Fla.1973), *aff'd,* 498 F.2d 1340 (5th Cir. 1974) (per curiam), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). Since plaintiff apparently challenges the entire body of these Corps procedures, however, the Court finds it advisable to address the main issue of the validity of the procedures.

cerned section 402 of the Federal Water Pollution Control Act, 33 U.S.C. § 1342, which established a national pollutant discharge elimination system.

The starting point for ascertaining whether a certain type of adjudication is "required by statute to be determined on the record after opportunity for an agency hearing"—and thus is governed by the procedural requirements of the APA for formal, trial-type hearings—is the statute that provides for the adjudication. *See, e. g., Marathon Oil Co. v. Environmental Protection Agency, supra,* 564 F.2d at 1262–63. As is noted above, here there are two statutes, section 403 and section 1344. Section 403 does not mention any type of hearing, but simply forbids, *inter alia,* the building of structures or filling or excavating in the navigable waters of the United States "unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army." Section 1344, on the other hand, states that permits for the discharge of dredged or fill material may be issued "after notice and opportunity for public hearings." Although this language does not specify what kind of hearing is contemplated and does not track the language of the APA, it is similar to the language of section 1342, which provides that the Administrator of the Environmental Protection Agency ("EPA") may issue permits for the discharge of pollutants, on certain conditions, "after opportunity for public hearing." And, as has been noted, courts have held that formal adjudicatory hearings *are* required for section 1342 permits. In so holding, however, those courts found the language of the statute unclear and thus looked beyond it to find other indications of "the substantive nature of the hearing Congress intended to provide." *Seacoast Anti-Pollution League v. Costle, supra,* 572 F.2d at 876.

When one looks beyond the words "opportunity for public hearings," one finds many differences between the permit program envisioned for section 1344 and that contemplated for section 1342. The permit program under section 1344 was entrusted to the Secretary of the Army and the Corps, whereas the section 1342 permit program was to be administered by the EPA. The procedural rules adopted for the section 1344 permit program appear in volume 33 of the Code of Federal Regulations, entitled Navigation and Navigable Waters, whereas those for the section 1342 permit program are in volume 40 of the Code of Federal Regulations, entitled Protection of Environment. Even though the phrase "public hearing[s]" is used in both section 1342 and section 1344, the public hearings of section 1344 have been held to be something very different from a trial-type adjudicatory hearing for the benefit of the applicant. The court in *United States v. Alleyne,* 454 F.Supp. 1164 (S.D.N.Y.1978), stated that "the notice and hearing provisions of Section 1344 and regulations thereunder are addressed to objectors to a permit application, not to the applicant.[4] *Id.* at 1172. The court continued: "Thus it is clear that defendant has no statutory interest in, or right to, notice and a hearing. To the contrary, defendant would hope that no public hearing was requested." *Id.* at 1173. *Accord, Sierra Club v. Alexander,* 484 F.Supp. 455, 470–71 (N.D.N.Y.), *aff'd mem.,* 633 F.2d 206 (2d Cir. 1980) (primary reason for public notice and public hearings by federal agencies is to elicit "input" from the *public* to assist the agency in determining whether a proposed act is in the *public* interest).

When Congress enacted the 1972 Amendments to the Federal Water Pollution Control Act, it assigned the responsibility for section 1344 permit program to the Secretary of the Army and the Corps, which had been administering a permit program under section 403 for many years in accordance with regulations now found at 33 C.F.R. §§ 322.1 *et seq.* At the same time, Congress assigned responsibility for the elabo-

---

4. The court noted that the safeguards for the applicant are found principally in his "opportunity to rebut the objections" of government agencies and others who submit adverse comments in response to the public notice. *Id.* at 1173. In the instant case, the plaintiff was afforded that opportunity to rebut.

rate new permit program under section 1342 to the EPA. It seems reasonable, therefore, to assume that somewhat different procedures were contemplated for the two different programs. It also seems reasonable to assume that the members of Congress knew that the Corps already was issuing construction and dredge and fill permits under section 403 in accordance with the procedures outlined in 33 C.F.R. §§ 322.1 *et seq.* and that the Corps was likely to use similar procedures for the new permit program. Nothing brought to the Court's attention from the legislative history of the 1972 Amendments indicates otherwise. Nor does the legislative history indicate that Congress intended that the same procedures be used for the section 1342 permit program and the section 1344 permit program even though they were to be administered by different agencies.

When Congress amended the Federal Water Pollution Control Act again in 1977, including section 1344, regulations governing the section 1344 permit program were already in effect. Presumably, the members of Congress were aware of them, since references were made to them in the reports on the proposed amendments. *See* S.Rep.No.370, 95th Cong., 1st Sess. 80, *reprinted in* [1977] U.S.Code Cong. & Ad. News 4326, 4405; H.R.Conf.Rep.No.830, 95th Cong., 1st Sess. 105, *reprinted in* [1977] U.S.Code Cong. & Ad.News 4424, 4480. Yet nothing has been cited to the Court from the legislative history that indicates any congressional intent *to make the procedures being used by the Corps for the section 1344 permit program more like those used by the EPA for section 1342 permits. Indeed, the only concern evidenced in the legislative history seems to be with eliminating red tape and delay in the processing of the large numbers of applications to the

Corps for permits,[5] rather than with making the procedures more elaborate, like the EPA procedures for section 1342 permits. *See* S.Rep.No.370, *supra* at 80, [1977] U.S. Code Cong. & Ad.News at 4405; H.R.Conf. Rep.No.830, *supra* at 104–05, [1977] U.S. Code Cong. & Ad.News at 4479–80. In the absence of any indication that Congress found the Corps procedures and regulations inadequate and in need of change, this Court must assume that Congress approved of them. *See Corn Products Refining Co. v. Commissioner of Internal Revenue*, 350 U.S. 46, 52–53, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955); *Heard v. Commissioner of Internal Revenue*, 326 F.2d 962, 966 (8th Cir.), *cert. denied*, 377 U.S. 978, 84 S.Ct. 1884, 12 L.Ed.2d 746 (1964). If Congress has implicitly approved these procedures, this Court sees no reason to overturn them.

Under these procedures, this Court appears to be limited to the type of judicial review specified in 5 U.S.C. § 706(2)(A), under which the reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See Taylor v. District Engineer, supra*, 567 F.2d at 1336–37; *Joseph G. Moretti, Inc. v. Hoffman, supra*, 526 F.2d at 1312; *United States v. International Harvester Co.*, 387 F.Supp. 1338, 1341 (D.D.C.1974). Such a review is to be based on the administrative record, rather than on evidence taken by the reviewing court. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Joseph G. Moretti, Inc. v. Hoffman, supra*, 526 F.2d at 1312. Consequently, the plaintiff's application for a trial de novo must be denied.[6] *See Camp v. Pitts, supra*, 411 U.S. at 141–42, 93 S.Ct. at 1243–44.

SO ORDERED.

---

5. Even with regard to the section 1342 permits, the Supreme Court has recently expressed concern about the burden on the agencies in holding hearings on more than a tiny percentage of the permit applications. *See Costle v. Pacific Legal Foundation*, 445 U.S. 198, 215, 100 S.Ct. 1095, 1105, 63 L.Ed.2d 329 (1980).

6. The case on which the plaintiff principally relies in its argument in favor of a trial de novo, *United States v. International Harvester Co., supra*, was very different from the instant case. In *International Harvester*, the court "reluctantly" agreed to a trial de novo because the defendant was not even allowed "to present its views in writing." 387 F.Supp. at 1341.