**NATIONAL WILDLIFE FEDERATION, et al., Plaintiffs,**

v.

**John O. MARSH, Jr., Secretary of the Army, Defendant.**

**Civ. A. No. 80–2350.**

United States District Court, District of Columbia.

July 26, 1983.

David G. Burwell, Thomas G. Tomasello, Christopher H. Meyer, National Wildlife Federation, Washington, D.C., for plaintiffs.

Brent N. Rushforth, John P. Schnitker, James M. McElfish, Jr., Dow, Lohnes & Albertson, Washington, D.C., for defendant-intervenor.

Lawrence R. Liebesman, Daniel G. Steele, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This environmental-law proceeding involves the validity of a permit issued by the defendant, the Secretary of the Army, (Secretary or Army), to the Hampton Roads Energy Company,[1] a company seeking to build an oil refinery on Chesapeake Bay at Portsmouth, Virginia. Plaintiffs, National Wildlife Federation and other environmental groups, seek a judicial declaration that the permit was wrongfully issued and an injunction prohibiting the Secretary from authorizing any activities under the permit pending compliance with the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.;* section 404 of the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 (CWA), 33 U.S.C. § 1344, and the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 *et seq.*

For the reasons stated below, the Court finds merit in a number of the plaintiffs' claims and consequently enjoins the Army from authorizing any activities under the permit until certain significant procedural defects associated with the granting of the permit are rectified.

## BACKGROUND

Chesapeake Bay is the largest estuary in the United States, with 19 major rivers and hundreds of smaller rivers as tributaries. It serves as a habitat for numerous species

1. The Hampton Roads Energy Company was granted leave to intervene as defendant-intervenor early in the litigation, Rule 24, Fed.R. Civ.P.

of birds and fish, and as a valuable resource for tourism and recreation.

In March 1975, defendant-intervenor Hampton Roads Energy Company submitted an application to the Army Corps of Engineers, Norfolk District, for a permit to undertake work in the Chesapeake Bay in conjunction with its construction of an oil refinery along the west bank of the Elizabeth River in Portsmouth, Virginia.[2] The application called for the construction of a marine terminal, the dredging of an access channel and anchorage basin, and the disposal of the dredged fill. The undertaking required a permit from the Army Corps of Engineers under section 10 of the Rivers and Harbors Appropriation Act of 1899 (RHA), 33 U.S.C. § 403, and section 404 of the CWA. The Army Corps' District Engineer for the Norfolk District issued a public notice and invited comment on the permit application. *See* 33 C.F.R. §§ 325.1(a); 325.2(2)(3); 325.3. In addition, pursuant to section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and 33 C.F.R. § 325.4(b)(3), the District Engineer released a draft Environmental Impact Statement for public review and comment.

Numerous comments on the proposal were received from federal, state, and local agencies as well as from private groups and citizens. A public hearing was then held in the spring of 1976. *See* 33 C.F.R. §§ 325.-2(a)(5); 325.3(b)(3); 327. Illustrating the deep public interest in the project, more than 1,000 persons attended the hearing, where the plaintiffs and other organizations offered testimony, statements, and recommendations. These were then utilized by the District Engineer in the preparation of a Final Environmental Impact Statement (FEIS),[3] which was released to the public for review and comment. *See* 33 C.F.R. § 325.4(c). Again, intense public comment was generated, with 535 letters of comment received from various governmental agencies, citizens groups (including plaintiffs) and the general public.

In January 1978, the District Engineer recommended denial of the permit application finding that the risks to human health, water quality, and marine life outweighed the benefits accruing from the refinery's contribution to the nation's energy requirements.[4] He concluded that the project was not in the public interest. However, because this recommendation was contrary to the stated position of the Governor of Virginia, the matter was referred from the District Engineer to the North Atlantic Division Engineer of the Army Corps. *See* 33 C.F.R. §§ 325.8(b); 325.8(d)(2). Following the District Engineer's recommendation, some 83 additional comments were received into the administrative record.

Relying on the earlier documentation of the record, but drawing a contrary conclusion, the Division Engineer reversed the District Engineer's decision and recommended granting the permit subject to a number of conditions.[5] But because of objections to the issuance of the permit raised by a number of federal agencies—the National Marine Fisheries Service, the Fish and Wildlife Service and the Environmental Protection Agency—on environmental grounds, the Division Engineer's decision was not final, and the matter was referred to the Chief Engineer of the Army Corps. *See* 33 C.F.R. §§ 325.8(c); 325.8(d)(1).

---

2. Pending before the Supreme Court of Virginia is a lawsuit challenging Hampton Roads Energy Company's ownership of the refinery site.

3. Exhibit 214 of the Army's administrative record. (All subsequent exhibit numbers are to the administrative record).

4. January 1978 District Engineer's Report (Exhibit 328).

5. The language of the Division Engineer in his recommendation for the granting of the permit reveals the dilemma presented by the competing environmental and energy concerns.

> [T]he impacts of this proposal are potentially hazardous and it will require close supervision to ensure environmental integrity. In fact the costs and benefits of the project are so delicately balanced that I had great difficulty in reaching my recommendation. In my judgment, however, the national need for energy slightly outweighs the potential impacts to the environment.

Exhibit 454 at ¶ 5.

After a review of the proceedings at the District and Division levels, the Chief Engineer determined that a more extensive analysis of alternative refinery sites was required before he could pass on the merits of the permit.[6] To review the alternatives, he formed a Federal Interagency Task Force consisting of representatives from the Environmental Protection Agency, Department of Energy, the Coast Guard, the National Marine Fisheries Service, and the Fish and Wildlife Service. Based on the Task Force report and on additional information the Army Corps prepared and circulated for review a draft Supplemental Environmental Impact Statement (SEIS). *See* 33 C.F.R. § 230.11(b).[7] Later, a final SEIS[8] was prepared and released, and it too was subject to public comment.

The final SEIS was considerably expanded and incorporated the findings of the Task Force on alternative sites. Sixty-seven alternatives were discussed, 48 of which were summarily dismissed as inappropriate. The remaining 19—including the Hampton Roads site—were discussed in narrative form and the narrative was then summarized in a tabular matrix with letter-grade ratings. The Hampton Roads site fared poorly in the matrix, generally receiving one of the worst, if not the worst, set of ratings of the various sites.

Plaintiffs submitted comments on both the draft and the final SEIS. On the basis of the entire record, including the expanded analysis of alternative sites, the Chief Engineer made a preliminary decision to issue the permit to the Hampton Roads Energy Company, finding that the need for additional refinery capacity on the east coast outweighed the environmental costs.[9]

However, this decision of the Chief Engineer, even though the third determination made by the Army Corps, was not final. An earlier 1967 Memorandum of Understanding between the Secretary of the Army and the Secretary of the Interior required "full coordination and cooperation between their respective Departments" in permit decision-making. 33 C.F.R. § 325, App. B. Therefore, in November 1978, the Chief Engineer notified Interior and several other agencies of his tentative decision. The Departments of Defense, Energy, and the Treasury expressed support for the permit application. However, the Environmental Protection Agency, the National Oceanic and Atmospheric Administration, and, most importantly, Interior, expressed their opposition. Because of Interior's opposition, the permit proposal was referred to the Secretary of the Army for yet another determination, this time to be made in consultation with the Secretary of the Interior in accordance with the Memorandum of Understanding.[10]

The staff of the Secretary of the Army began an extensive review of the proposal. The Assistant Secretary of the Army (Civil Works) then reopened the comment period in response to various requests; conferred with representatives of the Departments of Commerce, Defense, Energy, Interior, Labor, Transportation, Treasury, and the Environmental Protection Agency, and had a

---

6. Section 102(2)(C)(iii) of NEPA, 42 U.S.C. § 4332(2)(C)(iii), requires that an environmental impact statement include a detailed statement on "alternatives to the proposed action."

7. 33 C.F.R. § 230 (replacing 33 C.F.R. § 209.-410 (1980)) is applicable by virtue of 33 C.F.R. § 325.4(b).

8. Exhibit 734.

9. In making his decision, the Chief of Engineers stated:

On balancing the factors of the public interest I have focused on two major issues: the need vs potential adverse environmental impacts. I have found the need for additional *oil refinery capacity and SPR [Strategic Petroleum Reserve] on the East Coast outweighs the adverse environmental impacts that would result from the construction and operation of the HRECO [Hampton Roads Energy Company] oil refinery and any potential for an oil spill.*
Exhibit 855 at 15.

10. 33 C.F.R. § 325, App. B, provides that "[i]n those cases where the Chief of Engineers and the Under Secretary [of the Interior] are unable to resolve the remaining issues, the cases will be referred to the Secretary of the Army for decision in consultation with the Secretary of the Interior."

member of the Secretary's staff meet with one of the plaintiffs and other environmental groups. The Assistant Secretary also further explored oil spill recovery possibilities.

To assist the Secretary of the Army, the staff of the Assistant Secretary also prepared a 100-page Staff Evaluation. In two respects, the environmental focus of the Evaluation differed to some extent from the focus in any of the earlier environmental impact statements and in the decisions of the various engineers. First, the Evaluation did not measure the benefits of the refinery in terms of the east coast's need for additional refinery capacity. Rather, it measured the benefits in terms of Net Economic Development (NED), that is, the reduction in the cost of transporting the refined oil products to the metropolitan centers of the east coast from the Hampton Roads refinery, as compared to the cost of transporting the oil products from Gulf Coast refineries. Second, the evaluation differed in its rating of the various site alternatives. When compared with the 18 other alternatives that were previously examined at length in the SEIS, the Hampton Roads site was rated by the Staff Evaluation as one of the five best, while in the SEIS' matrix the site was rated one of the worst. In explaining that seeming inconsistency, the Staff Evaluation said of the SEIS's matrix that

> [w]e find gross inconsistencies in the way narrative data were translated into the tabular matrix .... Because this information is very misleading on the comparability of [Hampton Roads] to other alternatives, we find the matrix invalid as a decisional guide. The evaluation of alternatives requires a more thorough analysis than the matrix offers. Our analysis follows:.... [11]

The Staff Evaluation was then placed in the administrative record *after* the close of the final comment period. The plaintiffs were thus unable to comment on the Evaluation.

The decision-making process closed in early December 1979, despite the objections of the Secretary of the Interior to the Staff Evaluation and to the issuance of the permit. The Secretary of the Army announced his decision in favor of the permit and, like the Chief and Division Engineers, he decided that the potential benefits outweighed the environmental costs of the project. However, in basing his decision on the 100-page Staff Evaluation, he departed from the analyses of the Chief and Division Engineers by measuring the benefits of the refinery in terms of savings in transportation costs, rather than in terms of the east coast's need for increased energy supplies. In addition, he relied on the analysis of alternatives in the Staff Evaluation, rather than on the analysis of alternatives in the SEIS. His decision closed the four-and-a-half year period of review. The permit was issued to the Hampton Roads Energy Company on December 28, 1979. Plaintiffs filed suit on September 16, 1980. Because of this lawsuit and another lawsuit currently pending before the Supreme Court of Virginia, Hampton Roads Energy Company has not begun construction of the refinery.

## ANALYSIS

National Wildlife contends that the permit is defective for two procedural reasons: first, because National Wildlife was denied the opportunity to comment on the 100-page Staff Evaluation, in contravention of the APA, section 404 of the CWA, and the Army Corps' regulation, 33 C.F.R. § 325.-3(a); second, because the underlying data employed in the Staff Evaluation concerning the reduction in transportation costs and the re-analysis of alternatives were never incorporated into the FEIS or SEIS, in contravention of NEPA. National Wildlife also contends that the permit is substantively defective in that the Secretary's decision was arbitrary and capricious on the

11. October 1979 OASA(CW) Evaluation of the Hampton Roads Energy Company Permit Case—A Proposed Refinery and Terminal Complex to be Constructed in Portsmouth, Virginia (Exhibit 1164) at 80.

merits. The Court considers each contention in turn.

## I. PROCEDURAL REVIEW

### A. Comment and Hearing Under the APA, the CWA and the Army Corps' Regulation.

■ The Secretary and Hampton Roads Energy Company concede that the procedure adopted by the Army Corps in passing on the permit amounted to only an informal adjudication,[12] but they argue that nothing more than an informal adjudication was required by the relevant statutes. National Wildlife, however, contends that section 404 of the CWA, by requiring "notice and opportunity for public hearings," confers a right to a formal, trial-type adjudication.[13] According to National Wildlife, the most flagrant violation of its purported right to a formal adjudication occurred with the placing of the Assistant Secretary's Staff Evaluation in the record without a public hearing and an opportunity for comment. National Wildlife claims that it was neither able to comment upon nor submit evidence regarding the new analysis of the refinery's benefits in terms of the reduced transportation costs.

The procedures for a formal adjudication are provided in sections 7 and 8 of the APA, 5 U.S.C. §§ 556–57. Under section 5(a), 5 U.S.C. § 554(a), the formal procedures of sections 7 and 8 are applicable to any "adjudication required by statute to be determined on the record after an opportunity for agency hearing." Thus, the determination of whether section 404 of the CWA mandates a formal, trial-type hearing, hinges on the question of whether its language, "after notice and opportunity for public hearing," constitutes a statute requiring an "adjudication . . . to be determined on the

record after an opportunity for agency hearing" under section 5(a) of the APA.

The Court is empowered to make this determination by virtue of section 10(e)(2)(D) of the APA, 5 U.S.C. § 706(2)(D), which states that a reviewing court shall set aside agency findings found to be "without observance of procedure required by law."

In support of its argument that section 404 requires a formal hearing, National Wildlife analogizes section 404 to section 402 of the CWA, 42 U.S.C. § 1342, which governs the issuance of permits by the Environmental Protection Agency for the discharge of pollutants. Three circuit courts have held that the language in section 402, "opportunity for public hearing,"—language virtually identical to that of section 404—requires a formal adjudicatory hearing. See Seacoast Anti-Pollution League v. Costle, 572 F.2d 872 (1st Cir.), cert. denied, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978); Marathon Oil Co. v. Environmental Protection Agency, 564 F.2d 1253 (9th Cir. 1977); United States Steel Corp. v. Train, 556 F.2d 822 (7th Cir.1977). The plaintiffs want the same sort of adjudicatory hearing to apply to the permit sought under section 404.

The Court, however, agrees with the Secretary, that the plaintiffs are entitled to no more than an informal adjudicatory hearing. Recently the Fifth Circuit in Buttrey v. United States, 690 F.2d 1170 (5th Cir. 1982), cert. denied, —— U.S. ——, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), decided that section 404 requires nothing more. Though aware of the similarity in language between sections 402 and 404, the court pointed out that it is "very possible 'for a term to have different meanings even in the same statute.'" Id. at 1175, quoting Environ-

---

12. A permit decision-making proceeding is clearly adjudication rather than rule making. The APA defines "adjudication" as the process of issuing an "order", 5 U.S.C. § 551(7), which in turn is defined to include "licensing," 5 U.S.C. § 551(6). "Licensing" is defined to include "the grant of a license," 5 U.S.C. § 551(9), which is defined to include an agency "permit." 5 U.S.C. § 551(8).

13. The comment and hearing procedures were conducted also pursuant to section 10 of the RHA, but National Wildlife does not contend that it has any right to a formal adjudicatory hearing under that section. See Taylor v. District Engineer, 567 F.2d 1332, 1336 (5th Cir. 1978); Nofelco Realty Co. v. United States, 521 F.Supp. 458, 460 (S.D.N.Y.1981).

mental Defense Fund, Inc., v. Costle, 631 F.2d 922, 927 (D.C.Cir.1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981). After examining the CWA's legislative history, which stressed the need for simplified permit procedures, Buttrey concluded that whatever procedures section 402 may mandate, section 404 requires only an informal hearing. Id. at 1175–76. That informal hearing is only a "speech-making hearing" at which "proponents and opponents of the project are allowed to be heard." Id. at 1176, quoting Taylor v. District Engineer, 567 F.2d 1332, 1338 (5th Cir.1978). The scope of such a hearing is suggested by the Army's regulations:

> Public hearing means a public proceeding conducted for the purpose of acquiring information or evidence which will be considered in evaluating a proposed Department of the Army permit action, or Federal project, and which affords to the public the opportunity to present their views, opinions, and information on such permit actions or Federal projects.

Buttrey, 690 F.2d at 1176, quoting 33 C.F.R. § 327.3(a).

In sum, the plaintiffs had no right under section 404 of the CWA to a formal adjudicatory hearing on the merits of the permit application.

However, this Court's determination that section 404 in conjunction with the APA requires only an informal, rather than a formal or trial-type, adjudicatory proceeding does not completely dispose of National Wildlife's claim. Section 404 provides for "public hearings"; the Army's regulations provide that there be an opportunity for "meaningful comments." 33 C.F.R. § 325.-3(a). Even in an informal adjudicatory setting, if the public is not apprised of the rationale behind a proposed decision, or if the public is informed of the rationale only after the close of the comment and hearing period, then the agency cannot be said to have provided a realistic opportunity for public hearings or meaningful comments. The requirements that

> an agency ... provide initial notices of proposed action, ... disclose internal reports, and ... state its reasons for acting as it did, all rest on the fundamental proposition that the right to comment or the opportunity to be heard on questions relating to the public interest is of little or no significance when one is not apprised of the issues and positions to which argument is relevant. Only when the public is adequately informed can there be any exchange of views and any real dialogue as to the final decision. And without such dialogue any notion of real public participation is necessarily an illusion.

U.S. Lines v. Federal Maritime Commission, 584 F.2d 519, 540 (D.C.Cir.1978) (footnotes omitted). In U.S. Lines, because the rationale for the agency's decision in an informal adjudicatory process was not disclosed to the public prior to the close of the comment and hearing period, the proceeding was remanded to the agency.[14] See Portland Cement Association v. Ruckelshaus, 486 F.2d 375, 392–93, 393 n. 67 (D.C.Cir.1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

---

14. Both the instant case and U.S. Lines deal with an underlying substantive statute (in our case section 404 of the CWA; in U.S. Lines, section 15 of the Shipping Act of 1916, 46 U.S.C. § 814) which triggers an informal adjudicatory proceeding under the APA. Compare section 15 of the Shipping Act, requiring "notice and hearing" with section 404 of the CWA, requiring "notice and opportunity for public hearings."

In U.S. Lines, the plaintiff complained of ex parte contacts with the agency. Agency action based upon ex parte contacts suffers from two failings: first, the rationale for the agency's action, because it is missing from the record, is immune from judicial review, and second, that rationale is not subject to comment and hearing. See U.S. Lines, 584 F.2d 540–41. In our case, the issue of judicial review is of no concern, since the Staff Evaluation was ultimately placed in the record. However, because it was placed in the record only after the close of the comment period, there does exist a serious question as to the existence of an opportunity for comment and hearing. Therefore, the portion of U.S. Lines' admonition concerning the lack of meaningful comment and hearing is equally instructive in our case.

■■■ Based on *U.S. Lines,* this Court holds that even in the informal adjudicatory process under section 404 of the CWA, the opportunity to comment and the right to a hearing both necessarily require that the Army present for public scrutiny the rationale and pivotal data underlying its proposed action *before* the close of the comment and hearing period. Unfortunately, that requirement was not satisfied in the administrative proceeding here. After a careful examination of the administrative record, the Court finds that the inclusion of the Staff Evaluation in the administrative record *after* the close of the comment and hearing period had the effect of shielding the essential data and the agency's rationale from public hearing and comment. Plaintiffs are correct that the pivotal analysis of the refinery's benefits in terms of reductions of transportation costs was absent from the administrative record as initially amassed; that it was the Staff Evaluation which first introduced the rather extensive array of data which formed the basis of the Secretary's decision; and that because this information was first introduced by the Staff Evaluation, the information improperly eluded the public comment and hearing requirements.

This sudden change marked by the introduction of the Staff Evaluation is best illustrated by juxtaposing the Staff Evaluation's treatment of the transportation cost advantage with the treatment of that advantage in the documents that were available for comment and hearing.[15] Of the Staff Evaluation's 100 pages, at least ten dealt with the benefits accruing from reduced transportation costs.[16] In contrast, no portion of the FEIS's roughly 180 pages of text or its massive appendices was devoted to the reduction of transportation costs associated with the Hampton Roads refinery as compared to the existing Gulf Coast refineries. The SEIS, which consisted of 115 pages of text and numerous appendices of bulk, devoted no more than eight sentences to transportation costs, and those few sentences provided no more than a projection that the reduction in transportation costs would amount to somewhere between $.60 and $1.00 a barrel.[17] The subsequent documents that were similarly open to the comment and hearing procedures added no new information; they merely reiterated in summary fashion those figures, usually in just a few sentences.[18] In-

15. Hampton Roads Energy Company and the Army submitted to the Court a list of exhibits within the administrative record that, according to the Army and Hampton Roads Energy Company, indicate that the transportation-cost rationale was reflected in the record prior to the close of the comment and hearing period. *See* Notice of Filing of Index to Documents from the Administrative Record Pursuant to the Court's Direction of January 17, 1983 (filed February 4, 1983). The Court has examined the listed exhibits, and finds that they do not support Hampton Roads Energy Company and the Army's contention.

16. *See* Staff Evaluation (Exhibit 1164) at 23–31, 61, 72.

17. The SEIS (Exhibit 734), at 1–3, ¶ 1.09, states that "[r]esidual must be moved by tanker at an additional cost of over one dollar per barrel. Thus, the East Coast must pay $.60 to $1.00 more per barrel of products over the cost of similar products on the Gulf Coast."

The SEIS, at 1–5, ¶ 1.21, states that "[e]ssentially one-half of the east coast demand is met by shipments of refined products from the Gulf

Coast to the East Coast. The cost of moving products by pipelines is about 60 cents per barrel. The cost of movement by water is about one dollar per barrel. Differences in posted prices between the two areas reflect this advantage for the Gulf Coast consumer over the East Coast consumer."

The SEIS, at 1–6, ¶ 1.22, states that "[i]f sites on the East Coast are not obtainable, and the capacity were to be considered for the Gulf Coast, one would be faced with constructing a refinery with a product mix alien to the demand pattern of the area of its location plus a high transportation fee of one *dollar per barrel* to move residual fuel by water (residual fuel cannot be pipelined)."

18. *See* November 1978 Permit Briefing for General Morris (Exhibit 833), at 4–5 (two sentences); November 1978 Chief of Engineers' Recommended Decision (Exhibit 855), at 5–6 (three sentences); January 1979 Comments from the Environmental Protection Agency (Exhibit 898), at 5 (one sentence); March 1979 Comments of the Department of Energy (Exhibit 1007), attachment at 3 (four sentences); June 1979 Comments for Energy Secretary Schlesinger (Exhibit 1116), at 1 (one sentence).

stead of transportation costs, the documents that were subject to comment and hearing focused on the nation's energy needs and the need for additional refinery capacity. The District Engineer,[19] the Division Engineer,[20] and the Chief Engineer,[21] all based their decisions on those considerations, not on transportation costs.

On the other hand, the Staff Evaluation's analysis of the refinery's benefits focused exclusively on the reduction of transportation costs, while dismissing other potential benefits.[22] Furthermore, that detailed analysis introduced data not contained in the record prior to the comment and hearing period. The Evaluation defined with precision the method of calculating the savings in transportation costs;[23] articulated the various assumptions underlying that method;[24] estimated with greater specificity than the earlier documents the potential savings per barrel, breaking down the figures into components applicable to various types of oil and various modes of transportation;[25] estimated, in millions of tons, the size of all the refinery's projected shipments of refined product;[26] set forth in undiscounted and discounted dollars the net estimated savings over the course of a 25-year period;[27] and then compared the reductions in transportation costs with the increased costs of the refinery measured in terms of potential oil spills.[28] Only in conjunction with these data, did the figures of $.60 to $1.00 per barrel in transportation-cost savings acquire any meaning. Interestingly, even the Army, in the Staff Evaluation, seemed to acknowledge that all this additional information was missing from the administrative record as it existed prior to the introduction of the Staff Evaluation:

> Recognizing that there is neither an absolute national need, *nor a record including estimates of the potential national (as opposed to private) benefits and costs,* the Department of Army has developed estimates of the National Economic Development (NED) [i.e. transportation] benefits and costs of the proposed refinery.[29]

Lastly, by now it should be abundantly clear that this new data introduced by the Staff Evaluation was not simply a "bit of background information" that may permissibly avoid the procedures for comment and hearing because of its inconsequence. *B.F. Goodrich Co. v. Department of Transportation,* 541 F.2d 1178, 1184 (6th Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 773 (1977). *Cf. Sierra Club v. Costle,* 657 F.2d 298, 387, 396–400 (D.C.Cir. 1981) (no improper denial of right to comment on informal rulemaking when some 300 submissions reviewed after the close of the comment period were not crucial to the rules validity). The Secretary relied upon the Staff Evaluation's analysis of the benefits derived from reduced transportation costs in concluding that the permit be issued. The Evaluation was perhaps the most important document influencing the Secretary's decision. In the Army's own words, it was the Staff Evaluation "which led to [Secretary of the Army Clifford] Alexander's preliminary finding."[30] Until the introduction of the Staff Evaluation, the import of the record was that the refinery's *raison d'etre* was its fulfillment of the nation's energy needs and its increase of the nation's refinery capacity. Only after

**19.** January 1978 District Engineer's Report (Exhibit 328), at 30, 39.

**20.** March 1978 Division Engineer's Report (Exhibit 454), at ¶ 5.

**21.** November 1978 Chief of Engineers' Recommended Decisions (Exhibit 855) at 15.

**22.** *See* Staff Evaluation, (Exhibit 1164), at 21–23.

**23.** *Id.* at 24–26.

**24.** *Id.* at 24–25.

**25.** *Id.* at 27.

**26.** *Id.* at 28.

**27.** *Id.* at 30.

**28.** *Id.* at 61, 72.

**29.** *Id.* at 24 (emphasis added).

**30.** Exhibit 1175, attachment (news release announcing granting of permit) at 2.

the close of the administrative record, with the introduction of the Staff Evaluation, did the true rationale and its supporting data become apparent: The refinery was to be built because of savings in transportation costs, not because of any materially beneficial contribution to the nation's energy supply.

Because of the sudden shift in rationale from energy need and refinery capacity to savings in transportation costs, and because of the introduction of new data relating to transportation costs, this Court finds that the public was denied its opportunity to comment and its right to a public hearing.[31]

B. *Validity of the FEIS and SEIS Under NEPA.*

National Wildlife challenges the validity of the FEIS and the SEIS on three grounds. First, National Wildlife claims that the transportation-cost data which were first introduced in the Staff Evaluation should have been included in the FEIS or SEIS. Thus, according to National Wildlife, the introduction of the transportation-cost data in the Staff Evaluation rather than the FEIS or SEIS violated not only the requirements of the APA, CWA and the Army's regulations that there be opportunity to comment and a right to a hearing, but also the requirement of NEPA that there be a detailed environmental impact statement. Second, National Wildlife claims that the Staff Evaluation's discussion of alternative sites differed in such a degree from the discussion in the FEIS and SEIS, that the Staff Evaluation effectively obliterated the analysis of alternatives in the FEIS and SEIS required by section 102(2)(C)(iii) of NEPA. Third, National Wildlife argues that apart from the invalidation of the FEIS and SEIS by the Staff Evaluation's subsequent re-analysis of alternatives, the FEIS and SEIS's discussions of alternatives

are, in and of themselves, inadequate. Specifically, National Wildlife claims that the SEIS's analysis of 67 sites was not extensive enough, in that 48 alternatives were dismissed summarily, some with just a few words, and that the examination of the remaining 19 sites neglected a number of crucial factors.

■ Before confronting these challenges, it is worth noting the rather circumscribed role of the Court in passing on the validity of an agency's actions under NEPA. While "NEPA does set forth significant substantive goals for the nation, . . . its mandate to the agencies is essentially procedural." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).[32] Thus, this Court's obligation is only "to insure a fully informed and well-considered decision," and the Court may not set aside the agency's decision "simply because the court is unhappy with the result reached." *Id. See North Slope Borough v. Andrus,* 642 F.2d 589 (D.C.Cir.1980).

Among the primary procedural mechanisms embodied in NEPA are the requirements that an agency include a cost-benefit analysis pursuant to section 102(2)(B) of NEPA, *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission,* 449 F.2d 1109, 1113 & n. 9 (D.C.Cir.1971); *Sierra Club v. Sigler,* 695 F.2d 957, 976–78 (5th Cir.1983); *Columbia Basin Protection Association v. Schlesinger,* 643 F.2d 585, 594–95 (9th Cir.1981), and a discussion of alternatives to the proposed action pursuant to section 102(2)(C)(iii). *E.g., Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980).

■ Of great importance to a reviewing court is the distinction to be made between

---

**31.** National Wildlife also claims that a second crucial component of the Secretary's decision similarly escaped comment and hearing by virtue of its inclusion in the Staff Evaluation: the analysis of alternatives sites. In light of this Court's conclusions regarding NEPA, *see* Part IB, *infra,* the Court need not reach the difficult question of whether, apart from NEPA, analyses of alternatives constitute vital information

that need be subjected to comment and hearing procedures.

**32.** Though "essentially procedural," a limited portion of judicial review under NEPA is still substantive. *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980). *See* Part II, *infra,* n. 35.

the environmental impact statement and the remainder of the administrative record. The cost-benefit analysis and the analysis of alternatives must be contained within the environmental impact statement standing alone, and not as complemented by the administrative record. Any substantial information pertinent to the cost-benefit analysis or the analysis of alternatives found in the administrative record, but not in the environmental impact statement, would render the impact statement inadequate under NEPA. *See Grazing Fields Farm,* 626 F.2d at 1072–74; *I–291 Why? Association v. Burns,* 517 F.2d 1077, 1081 (2d Cir.1975). The reason for this seemingly strict prerequisite lies in the reality that other parts of an administrative record do not receive the same wide circulation and consequent comment comparable to that accorded an environmental impact statement, *see Grazing Fields,* 626 F.2d at 1070, and thus Congress mandated in section 102(2)(C) of NEPA that the pertinent information be contained wholly within the impact statement. *See id.* at 1072.

▇ In light of these requirements of NEPA, the Court, mindful of its circumscribed role, nonetheless finds that the Army did not prepare an environmental impact statement in conformity with NEPA's dictates. The introduction of new information in the Staff Evaluation belied the adequacy of the FEIS and SEIS. The Court accepts National Wildlife's first two claims, and finds that as a matter of law the introduction of the transportation-cost data and the re-evaluation of alternatives in the Staff Evaluation invalidated the FEIS and SEIS. However, the Court does not accept National Wildlife's third claim that the analyses of alternatives in the FEIS and SEIS were themselves inadequate.

National Wildlife's first claim is that the late introduction of the transportation-cost data negated the adequacy of the FEIS and SEIS. The strength of that argument lies in the fact that the transportation-cost data was an integral part of the Army's cost-

benefit analysis; in the Army's own words, whether or not the refinery's reduction of transportation costs will outweigh the possible environmental harms, "*is the gut issue* on which the decision to grant or deny hinges." [33] Thus, the transportation-cost data, as part of the cost-benefit analysis, had to be included in the environmental impact statement under section 102(2)(B) and (C) of NEPA. The omission of the transportation-cost data from the FEIS and the SEIS was an impermissible evasion of the circulation and comment procedures which govern environmental impact statements; the transportation cost data should have been circulated as an additional supplement to the FEIS or SEIS.

Indeed, this conclusion is compelled not only by NEPA itself, but also by the Army's regulations, which require a supplement to the environmental impact statement "whenever ... new significant impact information, criteria or circumstances relevant to environmental considerations impact on the ... proposed action." 33 C.F.R. § 230.11(b). The benefit of reduced transportation costs, utilized by the Army as the benefit in the cost-benefit analysis, constitutes "new significant impact information" requiring a supplement to the FEIS and SEIS. *See Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991–92 (5th Cir.1981).

Thus, the omission of the transportation-cost data from the FEIS and SEIS, and the subsequent inclusion of the data in the Staff Evaluation violated section 102(2)(B) and (C) of NEPA and the Army's regulations.

The same conclusion is applicable to National Wildlife's second claim, that NEPA and the Army's regulations were contravened not only by the Staff Evaluation's introduction of new data relating to transportation costs, but also by its new analysis of alternatives. The discussion of alternatives in an environmental impact statement, mandatory under section 102(2)(C)(iii) of NEPA, is the "linchpin of the entire state-

---

**33.** Staff Evaluation (Exhibit 1164), at 99 (emphasis in original).

ment." *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 697–98 (2d Cir.1972). This Court finds that the analysis of alternatives in the Staff Evaluation effectively replaced the discussion of alternatives in the FEIS and SEIS with an entirely new analysis. The Staff Evaluation spoke of the "inconsistencies" between the narrative data and the tabular data in the SEIS; described the result as "very misleading on the comparability of HREC [Hampton Roads Energy Company] to other alternatives" and declared the SEIS's tabular matrix to be "invalid." The Staff Evaluation went on to provide "a more thorough analysis than the matrix offers." [34] In the Staff Evaluation's subsequent analysis, Hampton Roads Energy Company's site was rated one of the five best, while in the SEIS—or at least in the tabular portion of the SEIS—Hampton Roads Energy Company's site was rated one of the worst. Inescapably, the conclusion is that the actual examination of alternatives took place not in the FEIS or SEIS but in the Staff Evaluation, in violation of the holding of *Grazing Fields*, 626 F.2d at 1069, that a discussion of alternatives contained in a portion of the administrative record other than the environmental impact statement fails to satisfy section 102(2)(C)(iii) of NEPA.

■ This does not imply, however, that there is any merit to National Wildlife's third claim, that the FEIS and SEIS's analyses of alternatives are themselves inadequate. Until the introduction of the Staff Evaluation, the SEIS's consideration of the 67 sites stood as an adequate, if not exemplary, exploration of alternatives. National Wildlife's claim that an insufficient number of sites were examined, or that the examination was of insufficient depth, is meritless. *See Roosevelt Campobello International Park Commission v. U.S. E.P.A.*, 684 F.2d 1041, 1046–48 (1st Cir.1982) (examination of only three alternatives to the proposed refinery site was adequate under the circumstances). Rather, NEPA's strictures were violated by the replacement of the adequate discussion of alternatives in the FEIS with a new, also adequate, but sharply different discussion of alternatives which was not subject to the rigorous circulation procedures of an environmental impact statement.

In sum, by including new data and a new analysis of alternatives in the Staff Evaluation, rather than in a supplemental environmental impact statement, the Army was in violation of NEPA.

## II. SUBSTANTIVE REVIEW

■ In addition to attacking the procedures employed by the Army in passing on the permit application and in compiling the FEIS and SEIS, National Wildlife seeks substantive review of the merits of the decision itself. Essentially, National Wildlife wants this Court to declare that even if all the proper procedures had been adopted, that the decision to issue the permit was still incorrect because even a properly compiled record would not support such a decision. In conducting substantive review of this informal adjudication, the standard to be employed by the Court is the "arbitrary and capricious" standard of section 10(e)(2)(A) of the APA, 5 U.S.C. § 706(2)(A). *Buttrey*, 690 F.2d at 1183. Under this rather narrow standard, this Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). *See Buttrey*, 690 F.2d at 1183–84. When exercising this substantive review over those aspects of the agency's determination mandated by NEPA, this general obligation applicable to review of all informal adjudicatory proceedings, translates into the obligation of insuring "that the agency has considered the environmental consequences." *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980)

---

34. *Id.* at 80.

(per curiam). *See Grazing Fields,* 626 F.2d at 1072 & n. 2.[35]

For there to be a "clear error of judgment," there must be an "error . . . so clear as to deprive the agency's decision of a rational basis." *Almay, Inc. v. Califano,* 569 F.2d 674, 680 (D.C.Cir.1977), *quoting Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 35 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Always, the Court must be aware that "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823. *See Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 282–83 (D.C.Cir. 1981).

■ Though narrow in scope, this review is not limited to a particular portion of the record, such as the FEIS and SEIS; rather, the entire administrative record must be parsed. *Grazing Fields,* 626 F.2d at 1072.

National Wildlife, while recognizing this especially limited standard of review, none-theless argues that the Secretary's decision was arbitrary and capricious because that decision was not "based on a consideration of relevant factors," and the decision was "a clear error of judgment," lacking a "rational basis." The Court disagrees.

■ National Wildlife lists four relevant factors or environmental consequences which the Army allegedly failed to consider: the long term impact of oil spills; the chronic impact of oil spills; the cumulative impact of several sources of oil contamination; and certain relevant costs that would offset the claimed reduction in transportation costs.[36]

■ The first factor which National Wildlife claims was ignored is the long term effects of oil spills. Specifically, National Wildlife contends that as a result of the presence of sediments and certain wind patterns in Chesapeake Bay, any oil spills will have a much longer detrimental effect than that estimated by the Secretary in his final decision of December 10, 1979.[37] The Court finds that long-term effects, sediments, and winds, were all considered repeatedly in the record, especially in the FEIS.[38]

---

**35.** Not all courts distinguish as clearly as does *Grazing Fields* between the procedural and substantive aspects of review under NEPA. *See, e.g., Sigler,* 695 F.2d at 965 (combining both procedural and substantive criteria for review under NEPA).

**36.** In support of its contention that relevant factors were never considered National Wildlife submitted affidavits from two scientists and an economist. Plaintiffs' Motion for Summary Judgment (filed April 8, 1982) at Appendix I–III. The Army and Hampton Roads Energy Company oppose the submission of these affidavits, based on the principle that on review "the focal point should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam).

The Court agrees with the Army and Hampton Roads Energy Company and strikes the proffered affidavits. While it is true that *Camp v. Pitts* recognizes that exceptions exist that occasionally permit the reviewing court to look outside the record, *id.* at 142–43, 93 S.Ct. at 1244, especially when necessary to determine whether an agency has considered all the relevant factors, *Environmental Defense Fund, Inc., v. Costle,* 657 F.2d at 285, *citing Asarco v.*

*U.S.E.P.A.,* 616 F.2d 1153, 1160 (9th Cir.1980), those exceptions do not apply here. Upon examining the affidavits and the administrative record, the Court finds that the affidavits do not point out factors neglected by the Secretary, but rather ask the Court to "substitute its judgment for that of the agency." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823. Like the court in *Environmental Defense Fund v. Costle* this Court will strike these affidavits which do not point out neglected factors, but rather examine the propriety of the decision itself. 657 F.2d at 286.

**37.** December 1979 letter to Secretary of the Army Clifford Alexander to Secretary of the Interior Cecil Andrus (Exhibit 1175).

**38.** *See, e.g.,* FEIS (Exhibit 214) at 2–14 to 2–15 (winds and tides), 4–50 (winds and sediments), 4–55 (long term effects), 4–58 (sediments), 4–59 (long term effects), 4–63 (sediments), Q–84 (sediments), Q–86 to Q–87 (long term effects), Q–B–30 to Q–B–33 (winds and tides), Q–B–43 to Q–B–55 (winds); January 1978 District Engineer's Report (Exhibit 328) at 34 (sediments); FEIS (Exhibit 734) at C–56 (sediments); November 1978 Chief of Engineers' Recommended Decision (Exhibit 855) at 9 (long

The second factor supposedly ignored was the chronic impact of oil spills. By the word "chronic," National Wildlife means the sublethal effects on the various forms of wildlife. The Court finds that contrary to the assertion of National Wildlife, these effects were considered.[39]

The third factor, the cumulative impact of several sources of oil contamination, was also considered by the Secretary. National Wildlife claims that in measuring the damage from oil spills, the Secretary did not consider the existing background of pollutants, and instead calculated the effect of oil spills on an ideal, pristine environment. According to National Wildlife, pollutants ignored include oily ballast waters discharged from tankers and barges; oil discharges within the marine terminal; and oil discharged as a result of waste water treatment.

Again, the Court finds that the administrative record—especially the FEIS—reflects a consideration by the Secretary of these items.[40]

Fourth, National Wildlife alleges that there was no consideration of numerous relevant costs, such as refinery costs, transportation costs of crude oil (in contradistinction to refined oil, which was, of course, subject to extensive analysis in the Staff Evaluation), raw material costs, capital costs, labor costs, maintenance costs, etc.

Generally, costs are relevant to the Secretary's decision by virtue of the cost-benefit analysis required in the environmental impact statement under section 102(2)(B) of NEPA. However, the costs which National Wildlife claims were neglected by the Secretary are not the sort of costs which need enter the cost-benefit computations. First, these costs are economic, not environmental, costs; second, they are private costs to be borne by Hampton Roads Energy Company, not costs to be suffered by the general public. The cost-benefit analysis of NEPA is concerned primarily with environmental costs affecting the public, not with private economic costs. As the Secretary recognized, private investors can be relied upon to determine "that the establishment of an oil refinery in Portsmouth would be, from their perspective, an economic venture." [41] This Court's review of purely economic costs burdening only Hampton Roads Energy Company is "at most, a narrowly focused, indirect review." *South Louisiana Environmental Council, Inc. v. Sand,* 629 F.2d 1005, 1011 (5th Cir.1980). A court may examine the cost-benefit analysis only as it bears upon the function of insuring that the agency has examined the environmental consequences of a proposed project.

In order for a reviewing court to determine whether an agency has complied with NEPA by giving a "hard look" at the environmental considerations, the court must also consider whether the economic considerations, against which the environmental considerations are weighed, were so distorted as to impair fair consideration of those environmental consequences. Without such a showing there is no review of economic benefits.

*Id.* at 1011–12. In the present case, the Court finds that the deletion of these economic costs "does not change the cost-benefit ratio to such a degree that it actually distorts the context in which the environmental analysis occurs." *Id.* at 1013. In that respect, those private economic costs

---

term effects); February 1979 Corps Oil Spill Analysis (Exhibit 942) at d–1 to d–11 (sediments and long term effects); December 1979 letter of Secretary of the Army Clifford Alexander to Secretary of the Interior Cecil Andrus (Exhibit 1175) at 2 to 4 (sediments).

**39.** *See, e.g.,* FEIS (Exhibit 214) at 4–55, 4–57, 4–59 to 4–60, 4–62, 4–66, 9–12, Q–B–13 to Q–B–22.

**40.** *See, e.g.,* FEIS (Exhibit 214), at 4–55 to 4–56 (background pollutants generally), 4–47, 4–75 to 4–76, 9–44 to 9–45, A–16, C–13, Q–170 to Q–172 (ballast water discharges), 4–42 to 4–45, 4–53, Q–B–13 to Q–B–22 (oil discharges within the marine terminal), 4–47, C–4, C–9 to C–13, Q–A–2 to Q–A–2 to Q–A–5 (waste water treatment).

**41.** December 1979 letter of Secretary of the Army Clifford Alexander to Secretary of the Interior Cecil Andrus (Exhibit 1175) at 1.

which National Wildlife claims were neglected differ significantly from the costs in *Sigler*, where the court held that certain publicly borne environmental costs had to be incorporated into the cost-benefit analysis of the environmental impact statement. 695 F.2d at 979. In contrast, National Wildlife is pushing for the inclusion of privately-borne economic, rather than publicly-borne environmental, costs. These are not relevant to NEPA's cost-benefit analysis.[42]

In short, the Army's analysis of environmental harms, primarily resulting from oil spills, was extremely thorough; its examination of the important environmental factors, *see* 33 C.F.R. § 320.4(a), was not inadequate or "arbitrary and capricious." The decision was "based on a consideration of relevant factors"; it was not "a clear error of judgment," lacking a "rational basis."

## CONCLUSION

Despite the extensive, often admirable effort made by the Army, the Court finds that a number of flaws afflicted the administrative processing of the permit. First, the introduction of the transportation-cost data in the Staff Evaluation violated the APA, section 404 of the CWA, and 33 C.F.R. § 325.3(a). Second, the Staff Evaluation's introduction of the transportation-cost data and its re-analysis of alternatives violated section 102(2)(B) and (C) of NEPA. However, the Court finds no merit in the other challenges presented by National Wildlife to the issuance of the permit.

An appropriate Order accompanies this Memorandum Opinion.

---

**42.** This does not imply that economic costs are never an integral part of NEPA's cost-benefit analysis. For example, the reduction in transportation costs, while admittedly economic in nature, *was* a crucial component of NEPA's cost-benefit analysis, and the introduction of that data in the Staff Evaluation rather than the SEIS of FEIS violated NEPA. The reason for the peculiar importance of the transporta-tion costs lies in the fact that those benefits were trumpeted by the Secretary as the benefit outweighing all the environmental costs of the refinery. Thus, the omission of that data from the SEIS or FEIS changed "the cost-benefit ratio to such a degree that it actually dis-tort[ed] the context in which the environmental analysis occur[red]." *South Louisiana Council, Inc. v. Sand,* 629 F.2d at 1013.