MASSACHUSETTS GENERAL HOSPITAL *vs.* COMMISSIONER OF PUBLIC WELFARE
(and a companion case).

Suffolk. April 8, 1966. — May 4, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Old Age Assistance. Disability Assistance. Public Welfare. Hospital.*
*State Administrative Procedure Act. Evidence,* Prima facie evidence.

On the issue before a referee of the Department of Public Welfare, whether a hospital was entitled to be paid the whole or only part of claims for care furnished to aid recipients of a city under G. L. c. 118A and c. 118D, certain testimony by the experienced assistant director of the hospital, supported as to one of the recipients by testimony of a surgeon, established in favor of the hospital prima facie cases which were not rebutted by hearsay testimony concerning the views of the city welfare board's medical consultant, who did not testify, or by reports to the referee by a medical social consultant of the department whose "medical opinion[s]" had been requested by the referee, but who was not shown to have any relevant expert qualifications and did not testify; and, in proceedings under G. L. c. 30A, § 14, for review of decisions of the referee adverse to the hospital, it was held that the decisions were unsupported by substantial evidence and were arbitrary and capricious

within § 14 (8) (e) (g), and that on the record there was no occasion for further hearing in the department and decrees should enter directing the department to allow the hospital's claims in full.

PETITIONS filed in the Superior Court on March 5 and March 12, 1964.

The cases were heard by *Kalus, J.*

*Albert G. Tierney* (*Colette Manoil* with him) for the petitioner.

*Nelson I. Crowther, Jr.,* Assistant Attorney General, for the respondent.

CUTTER, J. These cases are petitions under G. L. c. 30A for judicial review of decisions of the commissioner denying payment to the hospital (MGH) for care given (a) to Mrs. Anna Schmidt, a recipient of old age assistance (see G. L. c. 118A, §§ 1–12), and (b) to one Smith, a recipient of disability assistance (see G. L. c. 118D). Appeals had been taken to the State Department of Public Welfare from the refusal of the Boston board of public welfare to pay for the later part of the hospital care of each aid recipient on the grounds, in the case of Mrs. Schmidt, that MGH's medical reports submitted were not sufficient, and, in the case of Smith, that he no longer needed "acute" hospital care. In each case the Superior Court affirmed a decision of the commissioner (acting through a department referee) denying compensation to MGH for a portion of the aid recipient's care.

We first outline facts which appear in the Schmidt record. The referee found that Mrs. Schmidt, age 82, was admitted to MGH on November 12, 1962, with a fracture of her right femur. She was discharged on April 1, 1963.

A letter to the Boston board from MGH, signed by a Dr. Wohl (January 3, 1963), reported that Mrs. Schmidt was admitted to MGH "with intratrochantetic fracture of the right hip. The following day she had open reduction and Jewett nail fixation of the fracture, and did very well subsequently except for some post-operative [difficulty] and phlebitis and arterial occlusion, possible secondary to a displaced bone fragment compressing the femoral artery and vein. Because of relative ischemia and skin break-

down of the right leg secondary to that, she may require hospitalization for another two to four weeks. She will eventually be discharged to a nursing home for several months until she is able to resume normal activity and return home to the care of her daughters.'' On February 20, 1963, Dr. Wohl wrote again, adding the following information: ''Post-operatively she suffered from phlebitis and from a markedly displaced trochanteric fragment compressed the profunda femoris artery, causing eschemia and an eschemic ulcer of the right leg. On January 25th she underwent exploration of the groin with excision of the displaced trochanteris fragment and skin grafting of the ulcer. She has had only a partial take of the skin graft, and may also require arterial reconstruction at some time. Her expected hospital stay is three to six weeks after which she can be discharged to a nursing home.'' On April 12, 1963, a Dr. Lawson reported for MGH that following the operation of January 25, 1963, Mrs. Schmidt ''did well except for a recalcitrant ulcer over the lateral surface of the right tibia, and she was discharged on the 1st of April 1963 for further convalescent care at the Lemuel Shattuck Hospital.''

Dr. Clay, assistant director of MGH, who had approved each of the three letter reports, testified before the referee.[1] He gave as his opinion, after a review of the records, that Mrs. Schmidt required hospitalization for the period of time represented by the record and that the medical information in the three letter reports was sufficient to explain the hospitalization and its duration.

The Boston board's objections to payment seem to have been based upon advice given in a mimeographed form letter to a social worker at the Roxbury Crossing division of the board by, or in behalf of, a Dr. Lynch, medical consultant of the board. This form letter suggested that, if MGH ''has failed to submit the required medical data in accordance with our Dept's. procedures, payment could be

---

[1] He had been engaged in hospital administration and medical work for over forty years, including six years service each in charge of Long Island Hospital, Boston, and as assistant superintendent of Peter Bent Brigham Hospital.

denied on that basis." Dr. Lynch did not testify before the referee. Dr. Clay testified that the MGH had no record "at any time that Dr. Lynch had any contact with the hospital." There was no testimony that Dr. Lynch, or any doctor in his behalf, ever saw Mrs. Schmidt.

After the hearing before the referee, the referee sent a memorandum to one Jack Guveyan, a medical social consultant of the State welfare department, enclosing a transcript of the hearing and the exhibits already mentioned. It concluded, "Would you kindly review all these materials and advise me *as to your medical opinion* [see fn. 10] concerning necessity of hospitalization involved" (emphasis supplied). Guveyan did not testify before the referee or in the Superior Court. There is no evidence in the record that Guveyan is a doctor or concerning his qualifications. The referee testified in the Superior Court that he himself had never attended any school of medicine, and that he had referred the material to Guveyan "[t]o get his opinion and advice on the medical evidence . . . at the hearing." Guveyan replied, giving what, without more, was described as "medical review team's finding (after review)." The reply said, "The information submitted obviously is confusing in view of fact that as of 1/3/63 . . . the diagnosis of arterial occlusion and phlebitis had been made and it was stated . . . [Mrs. Schmidt] would require an additional two to four weeks of hospitalization. Approval for reimbursement of prolonged hospitalization costs is therefore limited at most, through the month of February 1963."

In the Superior Court, the referee testified that when he submitted the material to Guveyan he had not made up his mind how he was going to decide MGH's appeal, but that "[w]hen . . . [he] received all the material back . . . [he] reviewed the material . . . procured at the hearing, and then . . . rendered a decision." The trial judge concluded "that the ultimate decision was made by the referee and . . . there was no resort to any extra-record facts." He also concluded that the "evidence before the referee was sufficient to support his finding."

The Smith case is in many respects like the Schmidt case.

On April 13, 1963, Smith, age 44, was admitted to MGH for spinal cord injury and chronic alcoholism with traumatic encephalopathy and symptomatic epilepsy. He was discharged on December 2, 1963, to the Lemuel Shattuck Hospital. The Boston board refused to pay his hospital expenses after July 30. A letter dated October 23, 1963, was sent to MGH by a Miss Roston, a social worker for the Boston board, stating that the board was "not going to cover . . . [Smith] as of July 30, 1963."

MGH conceded before the referee that, after October 15, 1963, Smith did not need "acute care." His discharge apparently was delayed until December 2 because MGH's efforts to place him in other facilities where he could be given less expensive, but necessary, care had been unsuccessful.[2]

Dr. Kermond, an orthopedic surgeon, then an assistant in that field at MGH and an instructor at the medical schools of Boston University and Harvard, testified that he himself attended Smith, and that Smith, in his opinion, "required this hospitalization." Dr. Kermond stated at length and in detail the history of Smith's hospitalization and medical problems.[3] He said that, in the early part of October, it was determined that "home care" for Smith was "unrealistic" and that it "would be necessary for him to have some kind of institutional care" as a lifetime program.

No medical testimony was offered by the Boston board. An intra office memorandum of Dr. Lynch, read into the record, was essentially only a direction to resist payment

---

[2] MGH's attorney stated to the referee that, although Smith did not need acute care after October 15, the hospital "just . . . [could not] put him out on the street," and he could not go into a nursing home. He needed accommodations of the type available at Lemuel Shattuck Hospital, which eventually admitted him. Efforts to place Smith in such accommodations (see fns. 3, 8) were made through the MGH social service department "as a matter of continuity of service."

[3] Among serious difficulties encountered by Smith were an unstable neck, acute tendinitis and bursitis in his shoulder, and recurrent urinary tract infection. Prolonged efforts were made to rehabilitate him "so that he could transfer independently from his bed to his chair." That objective, because of severe spasms, was not achieved. When it was decided that "lifetime hospitalization" would be necessary, an application was made, on October 10, 1963, to the West Roxbury Veterans' Administration (VA) hospital. This was rejected. An application to another VA hospital was pending when Smith was accepted at Lemuel Shattuck hospital.

for hospitalization after July 30. It stated that "it is felt that around 7/30/63 this patient should have been transferred to a facility such as the Lemuel Shattuck Hospital or Holy Ghost Hospital for physiotherapy and prolonged rehabilitation services." There is no evidence that Dr. Lynch ever saw the patient. Dr. Clay, also a witness in the Smith case, testified that Dr. Lynch never got in touch with him about Smith.[4]

1. Mrs. Schmidt was entitled to "[a]dequate assistance" as a person "in need of relief and support" who had reached the minimum age for old age assistance. See G. L. c. 118A, § 1 (as amended through St. 1962, c. 411), which in its fourth paragraph (as amended through St. 1961, c. 615) provided, "Such assistance shall also provide for adequate medical care for every recipient of assistance . . . and shall include provision for the services of a physician of such recipient's choice . . . ."[5]

Smith was entitled to disability assistance under G. L. c. 118D, § 1 (as amended through St. 1961, c. 127, § 2), which provides that each local board "shall give adequate assistance to every needy person resident therein who has reached the age of eighteen . . . but has not reached the minimum age . . . for old age assistance, who is permanently and totally disabled . . . ." Under § 4 (as amended by St. 1960, c. 659, § 1), such assistance "shall also provide for adequate medical care for every recipient . . . and shall also include a provision for the services of a physician of such recipient's choice, subject to such . . . regulations as shall be made by the department. Assistance . . . shall

---

[4] Following the hearing before him the referee sent to Guveyan, the medical social consultant, a memorandum, stipulated to be similar to that sent in Mrs. Schmidt's case. A reply dated January 29, 1964, was received. It said, "Not approved. On the basis of Dr. Kerman's [Kermond's] . . . [testimony]. I find no evidence that the patient was not ready for transfer to a chronic care facility." The referee then said that he "finds that there was no medical evidence to demonstrate that . . . Smith was not ready for transfer to a chronic medical facility." He denied payment for hospital benefits beyond July 30, 1963.

[5] By the fifth paragraph (as inserted by St. 1960, c. 781, § 5), it is provided that "[p]ayment for medical care . . . shall be by vendor payment." See also § 1, last paragraph (also as inserted by St. 1960, c. 781, § 5; see later amendment by St. 1964, c. 273, § 1).

include . . . payment for medical care," which, under § 5 (as amended through St. 1961, c. 267), in the case of "hospital services" shall be made "directly to the institution . . . furnishing such services."

The applicable statutes, in part at least, were adopted in connection with comparable Federal programs of medical assistance. See *Fenton* v. *Department of Pub. Welfare,* 344 Mass. 343, 345–346; *Massachusetts Gen. Hosp.* v. *Commissioner of Pub. Welfare,* 347 Mass. 24, 25. They are to be reasonably interpreted to carry out the obvious legislative and social purpose in devising the several remedial programs. See e.g. *Desmarais* v. *Standard Acc. Ins. Co.* 331 Mass. 199, 202; *Sun Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 340 Mass. 235, 238.[6]

2. Both under c. 118A, § 1, and c. 118D, § 4, it is stated that the assistance afforded shall be "adequate," thus indicating that it is to be furnished in accordance with the standards of good medical treatment applicable generally to members of the public able to pay for their care. It also plainly is intended that the physician of each aid recipient's choice shall be a major factor in providing and guiding the recipient's medical care and treatment. When an aid recipient is admitted to the ward of a hospital[7] where medical care is given by the hospital staff, the staff in effect becomes for the time being the physician of the recipient's choice. It thus has the direct responsibility of determining (subject to any necessary consent by the patient) what treatment and hospitalization are necessary.

In appraising the records before the referee, in respect of the issues which we decide, we are in the same position as the trial judge for the evidence before the referee is

---

[6] Generally comparable Federal beneficent, remedial legislation has been liberally construed. See *Kohrs* v. *Flemming,* 272 F. 2d 731, 736 (8th Cir.); *Celebrezze* v. *Bolas,* 316 F. 2d 498, 500 (8th Cir.). See also *St. Luke's Hosp. Assn.* v. *United States,* 333 F. 2d 157, 164 (6th Cir.), cert. den. 379 U. S. 963; *Randall* v. *Flemming,* 192 F. Supp. 111, 120 (W. D. Mich.).

[7] Reference was made before the referee to State Letter 137. We need not decide whether (as MGH's attorney contended) it was ineffective as a regulation. See *Massachusetts Gen. Hosp.* v. *Commissioner of Pub. Welfare,* 346 Mass. 739, 740–742. It (p. 10) recognizes that "[p]hysicians' and surgeons' services in teaching hospitals will be rendered without charge to the patient."

before us in the same form in which it was presented to the trial judge. MGH did show adequately in each case the hospital service for which it sought payment, that such service actually was rendered, and that the original hospitalization was necessary. As to these matters there was no dispute. Although more detailed evidence concerning each recipient's hospital record might have been presented before the referee, MGH also presented persuasive medical opinion testimony by the assistant director of the hospital (see fn. 1) concerning the necessity of all the hospitalization. Cf. *Massachusetts Gen. Hosp.* v. *Chelsea,* 344 Mass. 449, 451. In the Smith case, this was backed by the testimony of an attending surgeon. MGH, in each appeal, thus established a strong prima facie case. There was no basis in the record for questioning the good faith or reasonableness of the MGH medical experts' opinions in the absence of contrary expert medical testimony of a character affording the referee substantial ground for doing so. The burden thus shifted to the Boston board to establish by competent medical evidence that some part of the hospitalization could not reasonably be deemed necessary, or that the hospital was acting in bad faith, or substantially contrary to good medical practice, in continuing hospitalization.[8] This burden was not sustained. The hearsay testimony about Dr. Lynch's views, not presented by him personally in testimony subject to cross-examination, does not constitute substantial evidence to be weighed against MGH's prima facie case.[9] It is not necessary in these two

---

[8] In the Smith case, also, the Boston board had the burden of showing that there was in fact then available a reasonable, less expensive form of institutional care for Smith in his then condition. That condition clearly precluded, as MGH contended (see fn. 2), discharging him until a place had been found for him in a proper institution. The Boston board made no showing of any effort by it to confer with the MGH staff about the problem of placement or to assist in arranging a proper place for Smith elsewhere.

[9] See, for Federal court reviews of somewhat comparable administrative action, *Teeter* v. *Flemming,* 270 F. 2d 871, 874 (7th Cir.); *Kohrs* v. *Flemming,* 272 F. 2d 731, 736 (8th Cir.); *Celebrezze* v. *Warren,* 339 F. 2d 833, 838 (10th Cir.); *Randall* v. *Flemming,* 192 F. Supp. 111, 128 (W. D. Mich.). See also *Kerner* v. *Flemming,* 283 F. 2d 916, 921–922 (2d Cir.); *S. C.* 340 F. 2d 736, 738–739 (2d Cir.); *Torres* v. *Celebrezze,* 349 F. 2d 342, 345 (1st Cir.); *Haley* v. *Celebrezze,* 351 F. 2d 516, 519 (10th Cir.); *Davis & Randall, Inc.* v. *United States,* 219 F. Supp. 673, 678–679, 683 (W. D. N. Y. 3 judge ct.); *Tucker* v.

cases to decide whether or to what extent, if there had been a conflict of testimony by expert witnesses actually present before the referee, he would have been free, under the applicable statutes, to disregard the reasonable medical opinion, given in good faith, of those MGH doctors actually responsible for Smith's and Mrs. Schmidt's medical care merely because other doctors (not responsible for such care) had expressed in testimony a different opinion.

3. The report by Guveyan to the referee, after the hearing, did not provide medical contradiction of the expert evidence presented by MGH. Not only was there no showing that Guveyan had any medical or relevant expert qualifications, but he did not testify and thus was not available for cross-examination. What he reported was not, and could not be treated as, evidence. *American Employers' Ins. Co.* v. *Commissioner of Ins.* 298 Mass. 161, 166–169. *Boott Mills* v. *Board of Conciliation & Arbitration,* 311 Mass. 223, 226–227.[10]

For the reasons indicated the referee's decision is without evidential support, and is, in effect, arbitrary and capricious. See G. L. c. 30A, § 14 (8) (e) and (g). On the record there is no basis for the denial of MGH's claims. In view of the uncontradicted medical evidence presented by MGH and in the absence of any medical evidence to support the referee's decision, we see no occasion for remanding the matters for further hearing in the department. See the *Kohrs* case, 272 F. 2d 731, 736–737 (8th Cir., see fn. 9). Cf. the *Kerner* case, 283 F. 2d 916, 922 (2d Cir.), where the claimant's testimony was described as raising only "a serious question."

4. The final decrees are reversed, and new final decrees shall be entered directing that the State department allow MGH's claims.

*So ordered.*

*Celebrezze,* 220 F. Supp. 209, 216 (N. D. Iowa); *Lynch* v. *Tobriner,* 237 F. Supp. 313, 316 (D. D.C.); *Gray* v. *Celebrezze,* 245 F. Supp. 718, 720–722 (W. D. Va.); Jaffe, Judicial Control of Administrative Action, 595 et seq., 607 et seq. Cf. *Celebrezze* v. *Bolas,* 316 F. 2d 498, 506–507 (8th Cir.).

[10] The request made to Guveyan for his "medical opinion" sought substantially more than the type of clerical summarizing and analysis of evidence considered in *Clooney* v. *Civil Serv. Commn.* 349 Mass. 589, 590.