TOWN OF BROOKLINE & others[1] *vs.* COMMISSIONER OF THE
DEPARTMENT OF ENVIRONMENTAL QUALITY ENGINEERING
& others[2]
(and a companion case[3]).

Suffolk.  May 8, 1986. — September 8, 1986.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, & LYNCH, JJ.

*Environment,* Air pollution. *Administrative Law,* Decision, Judicial review,
Regulations, Adjudicatory proceeding, Agency's authority.

Description of the method employed by the Department of Environmental
Quality Engineering in determining that the emissions from diesel
generators at a proposed energy facility would not pose an unreasonable
risk of carcinogenic or mutagenic health effects. [407-409]
Where the Department of Environmental Quality Engineering, acting under
its regulations promulgated pursuant to G. L. c. 111, § 142B, concluded
that the emissions from diesel generators at a proposed energy facility
would not pose an unreasonable risk of carcinogenic or mutagenic health
effects, the department's decision was not vulnerable to attack on the
ground that, by permitting any deterioration or degradation of air quality
whatever, the agency had violated general policies articulated in the
respective preambles to the Federal Clean Air Act and to its own regu-
lations. [412]
In proceedings for the approval of a plan for construction of an energy facil-
ity, the Department of Environmental Quality Engineering did not err
in concluding that the evidence introduced by the opponents did not
raise as a serious issue any potential risk of bladder cancer caused by
emissions from diesel generators at the facility, and the agency, therefore,
proceeded correctly in not requiring the applicant to prove the absence
of that risk. [412-413]
The Department of Environmental Quality Engineering, having been granted
broad regulatory authority with respect to air pollution control, was
empowered to determine what degree of health risk would be tolerable

[1] Brookline Citizens to Protect the Environment, John Hermos, Lewis
Horwitz, and Margaret Hogan.

[2] The deputy commissioner of the Department of Environmental Quality
Engineering and Medical Area Total Energy Plant, Inc., intervener.

[3] Mission Hill Intervenors & another *vs.* Department of Environmental
Quality Engineering; Medical Area Total Energy Plant, Inc., intervener.

398 Mass. 404                                    405

Brookline v. Commissioner of the Department of Environmental Quality Engineering.

from emissions released into the air by a proposed energy facility, and the agency was not required to prohibit all possibility of air pollution. [413-414]

In approving the plan for a proposed energy facility, the Department of Environmental Quality Engineering was not required by State law to weigh the social and economic benefits of the facility against the health risks from emissions that it would release into the air. [414]

In a determination by the Department of Environmental Quality Engineering approving a plan for construction of an energy facility, Federal law did not preempt State procedures so as to require the agency to weigh the social and economic benefits of the facility against the health risks from emissions that it would release into the air. [414-415]

In determining the acceptability of the health risks created by the emissions which a proposed energy facility would release into the air, it was permissible for the Department of Environmental Quality Engineering, as an aid to comprehension, to compare those risks with well-understood natural and technological risks. [415]

CIVIL ACTIONS commenced in the Superior Court Department on February 4, 1985.

The cases were consolidated and were reported to the Appeals Court by *Cortland A. Mathers*, J. The Supreme Judicial Court granted a request for direct review.

*Thomas B. Bracken* for the town of Brookline & others.

*Galen Gilbert* for Mission Hill Intervenors.

*Michael Lambert*, pro se.

*Janet G. McCabe*, Assistant Attorney General, for Commissioner of the Department of Environmental Quality Engineering.

*Verne W. Vance, Jr.*, for Medical Area Total Energy Plant, Inc., intervener.

LIACOS, J. Medical Area Total Energy Plant, Inc. (MATEP), constructed a facility in the Mission Hill area of Boston, near the Brookline border, to provide steam, chilled water, and electricity to hospitals and educational and research institutions near the Harvard Medical School, and steam to the Mission Park housing complex. MATEP sought from the Department of Environmental Quality Engineering (DEQE) the required preconstruction approval of its plan. See 310 Code Mass. Regs.

§ 7.02 (2) (1983).[4] DEQE approved much of the plan, and we reviewed certain aspects of the DEQE decision. See *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g,* 387 Mass. 372 (1982). In *Brookline, supra,* we affirmed the decision of DEQE, in part, but remanded the matter to DEQE for a determination of the potential adverse health effects of the carcinogenic and mutagenic emissions from the diesel engine generators at the facility.[5] DEQE conducted additional hearings and rendered a decision on January 3, 1985, approving the MATEP plan after finding that the diesel portion of the plant does not pose an unreasonable risk of carcinogenic or mutagenic human health effects.

The town of Brookline, Brookline Citizens to Protect the Environment, and three Brookline residents (collectively, Brookline) sought judicial review of the decision pursuant to G. L. c. 30A, § 14 (1984 ed.), naming the commissioner of DEQE and MATEP as defendants. Mission Hill Intervenors[6] and Michael Lambert (collectively, Mission Hill) also challenged the decision pursuant to G. L. c. 30A, § 14, naming DEQE as defendant. MATEP was permitted to intervene in the Mission Hill action. The two challenges were consolidated and reported to the Appeals Court without decision. Mass. R. Civ. P. 64, 365 Mass. 831 (1974). All parties joined in a petition for direct appellate review, which we granted. We

---

[4] The history of this effort to obtain approval for the MATEP facility is set forth in *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g,* 387 Mass. 372, 374-376 (1982), and need not be repeated here.

The 1983 version of the regulations governing application and approval of facility plans is slightly different from the version in effect on the date of MATEP's original application. See 105 Mass. Reg. 18-38 (May 4, 1978) (compilation and history of Massachusetts air pollution regulations). The changes are not material to this action.

[5] On remand, the hearing officer defined mutagens and carcinogens as follows: "A mutagen is a chemical compound that causes changes in genes by altering the structure of the DNA contained in genes, altering the structure of chromosomes or changing the number of chromosomes. A carcinogen is a chemical compound that causes cancer."

[6] Mission Hill Intervenors is a group of four community organizations and three individuals.

now affirm DEQE's decision. We summarize the decision of
DEQE and the arguments of Brookline and Mission Hill.

1. *The DEQE decision.* DEQE approached its task after the
remand by first considering whether diesel exhaust generally
poses a significant risk to health as a carcinogen or mutagen.
If this question could be answered, "No," with an acceptable
degree of confidence, no further inquiry would be necessary.
DEQE found that the evidence supports the conclusion that
"the causation of human lung cancer is complex, involving
multiple causes often acting in combination. The causes include
smoking, occupational exposure and pollutants in the ambient
air. . . . [A] link between lung cancer in humans and exposure
to diesel exhaust cannot be ruled out." The evidence, however,
did not require the conclusion that a causal link exists between
mutagenesis and air pollution.[7]

---

[7] The evidence was contradictory.

In short-term biological mutagenic screening tests (bioassays) in which
cell cultures are treated with extracts from diesel exhaust, the results have
been variable. One class of compounds, nitroaromatics, is commonly present
in higher concentrations in diesel exhaust than in the exhaust from other
combustion sources. Nitroaromatics are highly mutagenic in bioassays.
Mutagenicity in a bioassay is not a positive indicator of carcinogenicity (or
mutagenicity) in live animals or humans, but it does provide reason to
conduct further tests.

In a study by the National Academy of Sciences, no convincing evidence
was found that diesel exhaust inhaled by laboratory animals was carcinogenic
or mutagenic. For example, rats and mice exposed to diesel exhaust in
concentrations from 350 to 7,000 micrograms of diesel particulates per
cubic meter of air showed no carcinogenic response. In tests in which
extracts of diesel exhaust emissions were painted on the skin of animals,
tumors have resulted.

Two studies of transportation workers reviewed by the National Academy
of Sciences showed no relationship between exposure to diesel exhaust and
human lung cancer. Two more recent studies showed some relationship
between occupations where a greater exposure to diesel exhaust could be
expected and elevated rates of lung cancer. All of these epidemiological
studies are subject to criticism. For example, it is extremely difficult to
account for the potentially overwhelming effect of smoking; the levels of
exhaust to which workers were exposed cannot be determined; and the
effects of exposure to other potential carcinogens cannot be eliminated.

DEQE exercised its technical expertise in evaluating the available scien-
tific data and concluded that it would be appropriate to err on the side of
caution: "[A] prudent regulator would conclude that diesel emissions have
a potential, albeit a low potential, to cause human lung cancer."

DEQE's next task, having determined that diesel exhaust is potentially carcinogenic, was to ascertain the magnitude of the risk that MATEP emissions might pose. The mechanism of cancer causation is largely unknown. One popular theory suggests that there is no level of exposure to a carcinogen which constitutes a threshold too little to cause cancer and a threshold enough to cause cancer. That is, exposure to any amount, perhaps even so little as one molecule, theoretically could result in development of the disease. Whether this theory is correct, it has been established for carcinogens, generally, that, as the exposure increases, the risk increases. The magnitude of the risk of cancer from MATEP emissions consequently depends on (1) the relationship between exposure to diesel exhaust emissions and increased risk of cancer and (2) the likely exposure of people in the area to emissions from MATEP.

There is no consensus that diesel exhaust, in fact, causes cancer. DEQE characterized a study of workers at the London Transit Authority (LTA) as the best available evidence on the risk of cancer due to diesel exhaust exposure. The LTA study compared lung cancer rates of the group of workers exposed to diesel exhaust in their jobs and the group of workers not exposed. The comparison showed no increased risk of lung cancer for workers exposed to diesel exhaust. This negative finding is not proof because there may have been risks that were unaccounted in the study. One witness before the DEQE analyzed the experimental data and statistically estimated the range of uncertainty in the data to determine the maximum undetected risk. (The maximum undetected risk is the greatest risk that could have been present without being found in the study.) DEQE considered the determination credible and found that there could have been a maximum undetected increase in the risk of lung cancer of 0.05% for each unit of exposure, arbitrarily set at inhalation of a concentration of one microgram of diesel exhaust particulates per cubic meter of air for one year.

DEQE next sought to calculate the likely exposure of people in the area of MATEP emissions. To determine the projected levels of emissions, DEQE worked with MATEP to develop

398 Mass. 404                                              409

Brookline v. Commissioner of the Department of Environmental Quality Engineering.

a testing program and authorized MATEP to operate two of the six diesel engines for a specified number of hours. MATEP collected and analyzed samples of the exhaust emissions. Using mathematical models, MATEP calculated the likely emissions and dispersion of the diesel exhaust under varying conditions. The mean annual concentration of diesel exhaust particulates from MATEP emissions within seventeen kilometers of the facility was calculated to be approximately 0.01 micrograms of particulates per cubic meter of air. Under very unfavorable assumptions, the maximum particulate concentrations would be approximately 0.1 micrograms per cubic meter. Inhalation of the expected emissions would, therefore, increase the risk of lung cancer for a person continuously exposed for one year by 0.005% at most, according to the model and calculations. This risk is roughly equivalent to the risk one would incur by smoking one cigarette every year.[8]

After assessing the magnitude of the potential risk from MATEP diesel emissions, DEQE considered whether the risk was too great to permit approval of the MATEP diesel units. As part of this process, DEQE considered the magnitude of other risks common in our society. Using these comparisons, DEQE determined that the potential risk due to MATEP diesel operation is not unreasonable and consequently approved MATEP's application.

2. *Arguments of Brookline and Mission Hill.* Brookline and Mission Hill make several arguments against DEQE's decision: (a) MATEP emissions will degrade the quality of the air, and DEQE could not approve the facility in light of that degradation; (b) DEQE improperly shifted to Brookline the burden of proving that diesel exhaust emissions are associated with bladder

---

[8] Some witnesses translated this risk into predictions of the excess deaths due to lung cancer that could occur in the exposed population. DEQE considered the "excess-deaths" calculation as one way to put the risk in perspective. In the exposed population, approximately 30,840 deaths due to lung cancer are expected to occur over the next forty years. During that same period, if the actual risk due to diesel emissions is equal to the maximum undetected risk in the best available study and the least favorable conditions are assumed, three to four lung cancer deaths may be attributable to MATEP emissions.

cancer, instead of leaving the burden on MATEP to show that diesel exhaust emission do not cause bladder cancer; (c) DEQE exceeded its authority by applying a "reasonableness" test to the potential risk; (d) DEQE cannot approve the construction of a facility that may have detrimental health effects without finding a social or economic benefit or need that offsets those effects; (e) DEQE's decision not to consider such benefits is not supported by Federal law; and (f) DEQE cannot compare the risks associated with a proposed facility to risks due to other exposures in order to determine whether the facility should be approved.[9] The parties do not argue that the factual findings are not supported by substantial evidence. Nor do they contest the validity of the regulations under which DEQE made its findings. Cf. *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g,* 387 Mass. 372 (1982) (upholding validity of 310 Code Mass. Regs. § 7.00).

3. *Review of the DEQE decision.* We review an agency's adjudicatory decisions to determine whether a decision was reached within the proper bounds of agency decision making enumerated in the statute. G. L. c. 30A, § 14 (7) (*a*) - (*g*). We "give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14 (7). The courts should not intrude lightly within the agency's area of expertise. DEQE's decisions are not to be overturned unless they are contrary to law or "unreasonable, arbitrary, whimsical, or capricious." *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge,* 395 Mass. 535, 553 (1985), quoting *Moysenko* v. *Board of Health of N. Andover,* 347 Mass. 305, 308 (1964). See *American Grain Prods. Processing Inst.* v. *Department of Pub. Health,* 392 Mass. 309, 329 (1984); *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 524-525 (1979); *School Comm. of Springfield* v. *Board of Educ.,* 362 Mass. 417, 441-442 (1972).

---

[9] Brookline also claims that it is entitled to attorney's fees under 42 U.S.C. § 1983 (1982). Brookline does not succeed in showing "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (1982). Consequently there is no liability.

398 Mass. 404                                    411

Brookline v. Commissioner of the Department of Environmental Quality Engineering.

In reviewing a decision of an agency construing its own regulations, "considerable deference is due." *Northbridge* v. *Natick*, 394 Mass. 70, 74 (1985).

Our first task is to examine the statute granting DEQE authority to regulate air pollution. The statute involved in this case is G. L. c. 111, § 142B (1984 ed. & Supp. 1985).[10] The pertinent part of § 142B provides that the DEQE "shall control the pollution of the atmosphere within said district [the metropolitan Boston area]. [DEQE] may from time to time, after a public hearing, prescribe and establish, amend or repeal, rules and regulations to prevent pollution or undue contamination of the atmosphere within said district." The statute provides that DEQE shall accomplish its mission through rules and regulations. These rules and regulations may be promulgated in rule making proceedings, or they may be announced and applied in an adjudicatory proceeding. *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g, supra* at 379.

The Legislature has granted DEQE broad authority. The role of DEQE in the statutory scheme is to take primary responsibility for the regulation of air pollution. The Legislature has chosen to put into the hands of an expert administrative agency the decision making regarding complex issues of environmental health science. DEQE thus is charged with evaluating the technical evidence and reaching a decision on the risk attributable to the new source. That decision includes a determination of the boundary within which the risk will be acceptable. As we noted in our previous review of DEQE's MATEP decision, "[w]hat may be injurious to life or interfere with the comfortable enjoyment of life is best left to the DEQE to determine on a case-by-case basis in light of the most current scientific evidence." *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g, supra.*

We examine the agency decision mindful of our limited role of review as we consider the arguments of Brookline and Mission Hill.

---

[10] Except for two changes, not material to this action, regarding confidential information (see St. 1979, c. 55) and amending the penalty structure (see St. 1985, c. 335, § 2), the statute is unchanged since 1975.

a. *Degradation of air quality.* Mission Hill argues that the decision of DEQE violates the policy of preventing deterioration or degradation of air quality in violation of Federal and State law. See 310 Code Mass. Regs. § 7.00, Preamble; 42 U.S.C. § 7401(b)(1) (1982). The argument cannot succeed. As to the Federal statute, MATEP has been adjudicated exempt from the nondegradation provisions of the Federal statute. *Brookline* v. *Gorsuch,* 667 F.2d 215, 219, 223 (1st Cir. 1981). Consequently, MATEP does not violate the general preamble of the Federal Clean Air Act when it is exempt from requirements specifically set forth on the same issue. Additionally, the general preambles to the Federal statute and the DEQE regulations do not take precedence over specific provisions in each. *Milk Control Bd.* v. *Gosselin's Dairy, Inc.,* 301 Mass. 174, 179-180 (1938). *Association of Am. R.Rs.* v. *Costle,* 562 F.2d 1310, 1316 (D.C. Cir. 1977). We cannot perceive, also, how it can be claimed that MATEP fails to meet the general exhortation of DEQE's regulatory preamble when the MATEP facility is approved under the regulation specific to the question.

b. *Burden of proof.* Brookline introduced evidence that it says links diesel emissions to bladder cancer. DEQE said that the evidence was insufficient to raise the bladder cancer risk as a serious issue and did not require MATEP to prove the safety of its facility in relation to bladder cancer. Brookline complains that DEQE improperly shifted to Brookline the burden of proving that the facility will pose a danger of bladder cancer.

The parties agree that, once a serious issue of risk has been raised by an opponent, the applicant bears the burden of proving that the facility will be safe with regard to that issue. They disagree about DEQE's decision that Brookline's bladder cancer evidence did not raise a "serious issue."

DEQE's procedure of requiring an opponent to raise an issue before requiring the applicant to prove the lack of risk is certainly rational. Cf. *Foxboro Assocs.* v. *Assessors of Foxborough,* 385 Mass. 679, 683-684 (1982). The threshold question is, What evidence suffices to raise a "serious issue?" Evaluation of scientific evidence on the question of cancer

398 Mass. 404                                                413

Brookline *v.* Commissioner of the Department of Environmental Quality Engineering.

causation is a matter squarely within the expertise of DEQE, and we hesitate to intrude. We cannot say that DEQE's finding was wrong. The study introduced by Brookline is certainly far from conclusive. The authors themselves cast doubt on the possible connection. "[D]etermination was not possible of whether the elevated bladder cancer risk observed among truck drivers was attributable to diesel exposure." Silverman, Hoover, Albert & Graff, Occupation and Cancer of the Lower Urinary Tract in Detroit, 70 J. Nat'l Cancer Inst. 237, 243 (1983).

c. *DEQE's authority to determine the reasonableness of the risk.* Brookline claims that DEQE has trespassed upon the exclusive authority of the Legislature by making a determination that a reasonable risk could be approved.[11] Brookline says that DEQE must disapprove a facility that "will cause . . . a condition of air pollution." 310 Code Mass. Regs. § 7.01.[12] DEQE claims that the regulations, implementing the statutory policy, "recognize the need of society to tolerate certain emissions. It is thus consistent with the purposes of the Act for the [DEQE] generally to determine that it is not required to regulate insignificant risks . . . ."

---

[11] Brookline would not extend its argument to risks which potentially could result in "less than a single human death." The statistical risk calculations are dependent on the number of persons exposed to the potential hazard and represent the accumulation of the individual risks. A risk assessment of 0.99 excess cancers in an exposed population of 10,000 is the same as the risk of 99 excess cancers in an exposed population of 1,000,000. The statistical risk of each exposed individual is the same. Because DEQE's approach is permissible, we need not consider MATEP's argument that Brookline's "one whole death" standard is unrealistic and inappropriate.

[12] "Air pollution" is defined in 310 Code Mass. Regs. § 7.00, as follows:

"*AIR POLLUTION* means the presence in the ambient air space of one or more air contaminants or combinations thereof in such concentrations and of such duration as to:

"a. cause a nuisance;

"b. be injurious, or be on the basis of current information, potentially injurious to human or animal life, to vegetation, or to property; or

"c. unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business."

DEQE claims that it is not required to prohibit all possibilities of air pollution. DEQE recognizes that any level of diesel emissions may create some risk but argues that the same is true of virtually all industrial activities. There is no indication in the statute that the Legislature intended the imposition of the ultimately stringent zero-risk standard. We must presume that, had the Legislature intended such a stringent standard, it explicitly would have said so. The Legislature did not impose a zero-risk standard, but placed the authority to regulate in DEQE. The statute permits DEQE broad authority to control pollution. See *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g,* 387 Mass. 372, 379-380 (1982). DEQE clearly has not erred in drawing the line between reasonable and unreasonable risks. As to the meaning of DEQE's own regulations, unless their interpretation is patently wrong, unreasonable, arbitrary, whimsical, or capricious, "we cannot substitute our own judgment for that of the commissioner." *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge,* 395 Mass. 535, 553 (1985). *Northbridge* v. *Natick,* 394 Mass. 70, 74 (1985).

d. *Failure to balance benefits or necessity against risk.* Both Brookline and Mission Hill claim that DEQE erred by failing to weigh the risks due to MATEP's diesels against the corresponding benefits. DEQE says that its job does not include deciding whether a facility will be efficient or socially or economically desirable, but only what its environmental impact will be. Brookline argues that a finding of benefit is required, but cites no authority except testimony of a former administrator of the Federal Environmental Protection Agency (EPA) who explained that such a finding was required under an informal EPA policy. DEQE is correct. There is nothing in the statute requiring DEQE to consider any benefits that might be gained from a facility seeking approval.

e. *Lack of support in Federal law.* Brookline argues that DEQE misapplied Federal law in its decision. MATEP, Brookline, and Mission Hill all advocated that DEQE use a balancing test of costs and benefits to decide whether the MATEP diesels should be approved. The hearing officer correctly noted that

the statute does not call for balancing. She considered Federal law analogies to determine whether balancing should be permitted under the statute. We have held in this case that balancing is not required by the statute. Federal law does not preempt the Commonwealth's authority in this matter, so long as the Commonwealth does not adopt any emission standard that is less stringent than Federal standards. 42 U.S.C. § 7416 (1982). We agree with DEQE that a procedure that does not balance benefits against risks is no less stringent than a procedure that does balance benefits against risks. Thus, Federal law is inapposite on this point, and we need not consider further arguments relating to Federal law.

f. *Relative risk comparisons.* Brookline argues that DEQE's comparison of the risks due to MATEP emissions to risks from other hazards was impermissible. Brookline points out characteristics that distinguish the risks compared and forewarns that use of comparisons may lead to approval of progressively more hazardous facilities. This is a decision to be made by the agency within its area of expertise. The court will not scrutinize the agency's method of decision making except to assure that it is rational and conforms to the law. See G. L. c. 30A, § 14; *Arthur D. Little, Inc., supra.*

The meaning of an increase in risk of 0.005% is difficult to grasp. "Because it is so difficult to gain an intuitive grasp of the magnitude of risks, especially those of great severity but very low probability, risks are often expressed in several ways and compared to classical or 'natural' risks or to well-known technological risks, as an aid to comprehension." W. Lowrance, Of Acceptable Risk: Science and the Determination of Safety 73 (1976). DEQE used the comparisons of the MATEP diesel emission risk and other risks as an aid to comprehension and as a means to understand better the magnitude of risks society generally chooses to accept. Such comparisons are part of a rational method of determining the acceptability of a risk.

We do not share the sense of impending doom that risk comparisons seem to evoke in the Brookline challengers. Brookline's fears that such comparison will lead to approval of ever dirtier emissions are unfounded. We see no reason to

presume that DEQE will abandon its statutory role of rationally determining what risks are acceptable to our society under its statutory mandate.

4. *Summary*. DEQE determined that the potential risk of cancer due to the diesel exhaust emissions from the MATEP facility was reasonable. Brookline and Mission Hill sought judicial review of the decision and challenged it on several grounds. Absent agency error or other just cause, see G. L. c. 30A, § 14, the court will not overturn the reasonable determination by DEQE that the potential risk due to MATEP is within acceptable limits. We have reviewed DEQE's decision and the challenges of Brookline and Mission Hill. The DEQE approval is reasonable. There was no error. A judgment shall enter in the Superior Court affirming the decision of the Department of Environmental Quality Engineering.

*So ordered.*