Botsford, J.
In a final decision dated April 16, 1993, the Department of Environmental Protection (the Department) denied the application for a landfill construction permit filed by the plaintiff Douglas Environmental Associates, Inc. (DEA).[3] DEA brings this action to challenge that decision on a number of grounds; also raised are claims against the Commissioner of the Department and certain others related to actions taken by them in connection with the permit application proceedings.
By agreement of the parties, DEA is first pursuing its claim against the Department brought under G.L.c. Ill, §150Aand c. 30A, §14, which is setforthin Count IV of the verified complaint. To that end, the Department has filed the record of its administrative proceeding leading to the decision denying the permit. DEA has now filed a motion for partial summary judgment on the c. 30A claim; the Department opposes the motion. For the reasons discussed below, DEA’s motion for partial summary judgment is ALLOWED.
BACKGROUND
The record filed by the Department and submissions of the parties reveal the following undisputed facts. In 1987, DEA began the multi-step administrative process to obtain a permit to construct a solid waste landfill facility in Douglas, Massachusetts. The proposed landfill would include landfilling, recycling and composting operations, to be developed in four phases, with each phase allowing approximately five years of operating capacity. The landfill construction permit at issue here relates to phase one of the proposed landfill, and seeks approval for the construction of a 35-acre landfill with seven cells and related structures.[4] The proposed landfill would receive up to 1500 tons per day of municipal trash.
Before seeking the landfill construction permit, DEA was required to obtain a site assignment from the Douglas board of health.[5] The site assignment was granted on April 1, 1987; opponents to the landfill project then appealed the board of health’s decision to the Department. The Department’s review of the site assignment decision was stayed, however, to permit DEA to file with the Secretary of Environmental Affairs an environmental impact report concerning the proposed project in compliance with the Massachusetts Environmental Policy Act (MEPA), G.L.c. 30, §§62A-62H. On February 20, 1990, the secretary certified that DEA had met the requirements of MEPA by filing a complete report.
The Department then undertook its review of the board of health’s site assignment determination. On March 6, 1991, after a public hearing and a review of the public comments filed, the Department upheld the determination. Judicial review of the Department’s decision was sought by the Town of Webster and an unincorporated association called Citizens for a Clean Environment. In a decision dated August 21, 1992, a judge of this court (McDaniel, J.) affirmed the Department’s site assignment decision.
In contemplation of DEA’s application for the facility construction permit, DEA and the Department entered into a “Multiple Permit Alternative Schedule Project Fee and Schedule Agreement” (fee and schedule agreement) pursuant to the Department’s regulations. See 310 Code Mass. Regs. §4.00 et seq. Pursuant to the fee and schedule agreement, DEA paid the Department a permit application fee of $52,065; the Department in turn agreed to process and review the landfill construction permit within prescribed time frames and in accordance with 310 Code Mass. Regs. §4.00.
On February 27, 1992, the Department determined that DEA’s permit application was administratively complete. The Department then undertook a technical review of the application for the next six months. It determined during this process that additional information about, among other things, the hydrogeologic characteristics of the landfill site was needed, and DEA responded by providing more information and conducting more studies. On September 25, 1992, the Department determined that the application was technically complete; it also issued a decision granting DEA a draft landfill construction permit on the same date. After public notice, a public hearing on the draft permit was held on November 18,1992. Thereafter, on December 29, 1992, a public meeting was held in Douglas at the request of certain legislators. The public comment period on the draft permit was extended to January 15, 1993.
During the public comment period, the Department received many submissions, including a hydrogeology *408 report of Patrick Barosh & Associates (the Barosh report) and various letters concerning the existence of rare animal species on the proposed landfill site. On January 15, 1993, the DEP ceased receiving public comments and began reviewing the full permit application record.[6]
As part of its review, and following the close of the public comment period, the Department set up two “peer review” processes, one to deal with hydrogeological issues and one to deal with rare or endangered species questions. With respect to hydrogeology, the Department retained the services of seven hydrogeologists who were not otherwise employed by the Department or the Commonwealth — most worked for private companies — to conduct a review of the Department’s own technical file relating to the permit application as well as the information submitted dialing the public comment period.[7] This hydrogeological peer review committee met in February 1993 with several officials and staff of the Department to conduct the review and answer ten questions about hydrogeological concerns. A written report of the peer review committee’s responses was prepared by an employee of the Department and approved by all the committee members.[8] The report states that in the committee’s judgment, DEA had not submitted sufficient documentation of the proposed site’s bedrock fracture or lineament features to permit an informed decision that the site was monitorable. It also sets forth a detailed recommendation for a multi-phase study of the bedrock fracture system that should be undertaken. The report, dated March 19, 1993, was submitted to the Commissioner for his consideration in making a final decision on the permit application. That report was not provided to DEA or any other interested party before the Department's decision was issued.
The second peer review involved seeking the advice and recommendations of the Division of Fisheries and Wildlife (DFW) with respect to rare species issues raised by the permit application. Again, the Department set up this “review” after January 15, 1993. The commissioner of DFW submitted a letter to the Department on March 5, 1993, responding to questions posed by the Department. The DFW letter sets forth information about observations of certain rare species in the area of the proposed landfill site which appears to come from the agency’s own records as well as records of a program entitled the Natural Heritage and Endangered Species Program. It does not appear that all of the factual information discussed in the DFW letter was presented to the Department during the public comment period. The DFW letter was not provided to DEA or any other interested party before the close of the public comment period.
On April 16, 1993, the Department issued its final decision on DEA’s permit application. The decision denies the application, and specifies that the denial is based on two issues: the hydrogeology of the site and protection of endangered and rare species. The Department determined that DEA had failed to satisfy its burden of demonstrating that the design, construction and operation of the facility and its monitoring system complied with applicable regulations and policies of the Department and were not threatening to the public health, safety or the environment; and that the facility site could be appropriately monitored. In its decision, the Department relies substantially on the opinions and conclusions stated by the hydrogeology peer review committee in its March 19, 1993 report, as well as on the advice and recommendation of DFW in its March 5, 1993 letter that additional surveys and studies of the potential presence of endangered and rare species would be required before a permit might validly issue. The decision also places a great deal of weight on the Barosh report.
DISCUSSION
DEA’s permit application is governed by G.L.c. Ill, §50A;[9] the statute provides in pertinent part that if a person is aggrieved by the department’s final decision on a landfill construction permit application, an appeal may be taken, and the appeal will be governed by G.L.c. 30A, §14. DEA argues here that under c. 30A, §14, the Department’s decision must be reversed because it is both procedurally and substantively flawed. I consider first some of the procedural errors which DEA claims to have occurred. My decision on these issues makes it unnecessary to rule on DEA’s substantive claims at this time.
1. The Department’s Claimed Violation of its own Regulations.
DEA argues that the Department’s final decision, in wholly reversing the tentative approval of the project encompassed in the issuance of the draft permit six months before, contravened several of the Department’s applicable regulations. The first in question, 310 Code Mass. Regs. 19.032(2), provides in relevant part as follows:
(2) Issuance of Draft Permit
(a) The Department shall prepare either a draft permit or draft denial. A draft permit shall include all appropriate conditions, standards, and requirements necessary to establish a new facility or conduct approved activities at an existing facility.
(b) If the Department decides to deny the facility a permit, it shall issue a draft denial.
DEA reads this regulation to require the Department to issue a draft denial before every final decision of denial and in all circumstances — including where, as here, the Department first issues a draft decision in the form of a draft permit, holds a public hearing and then issues a final decision of denial reversing the draft permit. The Department contends that §19.032(2) deals with draft decisions of both types— draft permits and draft denials — and treats both types in an identical fashion. Generally, the Department claims, §19.032(2) entitles a permit applicant to one *409 draft decision on a permit application and a final decision thereafter, following a public comment period and, in some cases, a public hearing as well.
I appreciate that on its own, §19.032(2)(b) can be read to require a draft denial in all cases where the Department ultimately decides to deny a permit. I am also of the view that the interpretation advanced by DEA would improve the procedural protections afforded a party such as itself against a relatively sudden reversal of position by the Department at the end of a lengthy and expensive proceeding. Nevertheless, I am persuaded that the Department’s own interpretation of the regulation should be given weight. Brookline v. Commissioner of the Dept. of Evtl. Quality Engineering, 398 Mass. 404, 414 (1986). The Department’s construction is a reasonable one that makes sense of §19.032(2) as a whole, and I accept it. See Bottomley v. Division of Admin. Law Appeals, 22 Mass.App.Ct. 652, 655 (1986) (courts give deference to an agency’s interpretation of an ambiguous regulation if the language can be reasonably so read).
DEA next argues that under 310 Code Mass. Regs. §19.035(1),[10] the Department was obligated to hold another public hearing when it decided to reverse its position on the draft permit. The regulation by its terms does not mandate such a result, and it seems reasonable to interpret the provision in question to require a public hearing when there is a modified draft decision and a public hearing has not previously been held. In any event, I do not agree that the regulation required the Department to follow the course advanced by DEA, given that a public hearing was held, and that the decision at issue is a final decision of the Department.
The same is true of the final regulatory provision cited by DEA, 310 Code of Mass. Regs. §19.034(1).[11] The Department afforded DEA time to submit public comments in this case, and this is all that the regulation, by its terms, requires.[12]
2. The Department’s Claimed Violations of Due Process
DEA claims that a trial-type, adjudicatory hearing was required on its permit application, given that its substantial property rights were intimately involved. The argument deserves rejection, for many of the reasons set forth in the Department’s memorandum. (See defendants’ consolidated memorandum, pp. 79-82.)
Far more compelling is DEA’s contention that the Department violated DEA’s constitutional right of due process when it relied on the results of the hydrogeo-logy and endangered species peer review processes— information solicited and received by the Department after the close of the public comment period — in reaching its final decision, without giving DEA a prior opportunity to respond.
An administrative agency may not base a decision on information that it received after the administrative proceeding concludes without giving the affected parties an opportunity to respond. See Vitale v. Planning Board of Newburyport, 10 Mass.App.Ct. 483, 487 (1980). See also United States Lines v. Federal Maritime Comm’n, 584 F.2d 519, 539-40 (D.C. Cir. 1978). Cf. National Wildlife Federation v. Marsh, 568 F.Supp. 985, 993-95, 1001 (D.D.C. 1983) (remand of decision to agency for further public notice and comment necessary where agency decision relied on a staff evaluation report that contained a rationale and included cost data which were not part of record available to the parties for review and comment). Cf. also Seacoast Anti-Pollution League v. Costle, 572 F.2d 872, 880 (1st Cir. 1978) (remand of EPA administrator’s decision called for where administrator based his decision on staff recommendations which in turn were based on material that was not part of the administrative record).
There is no disagreement in this case that the March 19, 1993 report of the hydrogeology peer review committee as well as the March 5, 1993 letter from the Commissioner of DFW were not part of the administrative record available to DEA before the Department’s final decision was issued. Nor can there be any argument that the Department’s Commissioner relied heavily on the substance of these documents in reaching the decision to deny the construction permit to DEA. What is disputed is whether the report and letter represent discrete sources of new information that DEA had a right to review before the administrative proceeding was complete. I conclude that they do.
The Department contends that the hydrogeology peer review committee did not consider any new data, but confined its review to the Department’s existing file. Accordingly, in the Department’s view, the peer review process was the equivalent of the Commissioner requesting his own staff to review and evaluate the administrative file or record and advise him of their views — a process that is, the Department asserts, an accepted and appropriate component of proper administrative procedure.[13]
I disagree. According to the Department’s final decision, the peer review committee members were selected because of their independent expertise (see Decision, pp. 5, 7), and the decision expressly gives credit to and relies on their conclusions as a discrete basis for denying the DEA permit. (See Decision, pp. 7-8, 11-12.) In these circumstances, it simply cannot be said that the peer review committee’s work is the exact equivalent of an internal staff evaluation of existing data. Rather, the committee’s opinions took on an identity and value of their own, and DEA had a right to review and comment on the committee’s report before the Department’s final decision was issued. Cf. Massachusetts General Hospital v. Commissioner of Public Welfare, 350 Mass. 712, 715, 717 n. 4 (1966) (error committed when agency’s adjudicatory decision was based in part on opinion of medical consultant to *410 whom the administrative record was sent for review after the administrative hearing was closed).[14]
Moreover, the hydrogeology peer review report reveals that the committee included in it not just evaluation but affirmative recommendations about the specific scope and design of further study of the bedrock fracture system at the site. (Administrative Record [R.J, No. 54 at pp. 4-6.) The Department’s decision discusses and adopts these recommendations in concluding that DEA has not demonstrated a basis for granting the permit, and must provide more analysis of the faults and fractures on the site. (Decision, pp. 11-12.) Certainly these detailed recommendations qualify as new information that DEA had the right to review. See Vitale, supra, 10 Mass.App.Ct. at 487.[15]
The peer review process relating to endangered and rare species presents a similar problem. The letter from the Commissioner of DFW, and specifically the recommendations contained in it regarding the need for further evaluation and the types of further study that should be conducted, are treated in the Department’s final decision as an independent basis for the conclusion that DEA did not demonstrate adequate compliance with applicable endangered and rare species regulations. (Decision, pp. 14-15.) The letter became, therefore, new information that DEA should have been able to respond to in a timely way. In addition, the March 5 letter indicates that DFW did go beyond the portions of the Department’s administrative record which the Department sent for review, and included in its evaluation other letters and information, thus again confirming the letter’s status as “new” information. Due process required that DEA see and be able to respond to this letter before the Department made up its mind.
In the circumstances presented, I conclude that the Department’s decision was based on unlawful procedure, and as a result, violated DEA’s constitutional due process rights. See G.L.c. 30A, §14(7)(a), (d). The appropriate remedy for the errors is to remand the case to the Department for further proceedings in which DEA (as well as, presumably, all other interested parties) will be provided with a full and fair opportunity to respond to the hydrogeology peer review committee report, the DFW letter and the issues raised in each.[16] See Seacoast Anti-Pollution League v. Costle, supra, 572 F.2d at 882; Marathon Oil Co. v. Environmental Protection Agency, 564 F.2d 1253, 1271-72 and n.54 (9th Cir. 1977).[17]
One final issue needs discussion: the Barosh report. The Department’s decision treats the report as a critical piece of information supporting its decision to deny the permit application on grounds of inadequate hydrogeological data. (See Decision, pp. 6-12.) It is true that the Barosh report was submitted to the Department within the public comment period (although at the very end), and DEA did not ask to extend or reopen the period to deal with the report. DEA argues that nonetheless, due process required the Department to give DEA the chance to respond to the Barosh report in light of the fact that the draft permit appeared to resolve all hydrogeological issues in DEA’s favor and the Barosh report was such a central piece of information on which the Department relied to reverse its previous position. There is no need to decide whether DEA's position on this due process claim or the Department’s opposing view is correct, however, in view of the fact that the case must be remanded in any event. In these circumstances, and given the position the Barosh report occupies in the Department’s decision, principles of fairness are best served by allowing DEA (and other parties) a full chance to respond to that report as part of the proceedings on remand.[18]
As suggested at the outset of this discussion, the need for a remand of this case to correct the procedural errors makes it unnecessary at this time to review DEA’s challenges to the substance of the Department’s decision. Depending on the outcome of the proceedings on remand, DEA may not remain an aggrieved party seeking to appeal, and in any event, the remand proceedings may lead the Department to make changes to its decision on the permit application that would render moot a review of the grounds set forth in the decision now at issue.
ORDER
For the foregoing reasons, the motion for partial summary judgment of the plaintiffs DEA and Barletta on Count IV of the complaint is ALLOWED. The administrative case is remanded to the Department for further proceedings in accordance with this decision, and in particular, to allow DEA a full opportunity to respond to the hydrogeological peer review committee report dated March 19, 1993, the letter from the Commissioner of DFW dated March 5, 1993, the Barosh report and any other matters the Department deems appropriate. This action is stayed pending completion of the administrative proceedings described here, or until further order of the court.

 The plaintiffs are referred to in this memorandum collectively as DEA.

 The Department has previously approved applications filed by DEA relating to the recycling and leaf composting operations.

 General Laws c. Ill, §150Agoverns the landfill permit application process, and provides, inter alia, that the applicant first seek a site assignment from the appropriate local board of health.

 DEA did not request to extend the public comment period beyond January 15 or to reopen it in order to respond to submissions filed by others, including the Barosh report, which was filed on January 13, 1993, two days before the *411 close of the period. DEA contends that it did not do so because the Commissioner of the Department assured its representatives, at a meeting held January 28, 1993, that he would give DEA the chance to respond if new issues were raised by the Department’s administrative record. It appears that the Department does not dispute the substance of what DEA argues the Commissioner said. (See defendants’ consolidated memorandum [defts. mem.], p. 67 n.22.) However, the Department takes the position that the Commissioner was referring only to new issues not previously considered — such as, hypothetically, evidence that hazardous waste was present on the proposed site — and not new points about long-existing issues, such as hydrogeological concerns. (See id.) DEA’s position is that it understood “new issues” to encompass both new subject matter and new positions that the Department was contemplating taking on any existing issues, in comparison to the positions it took in connection with the draft permit. I cannot resolve this dispute over the proper interpretation of the Commissioner’s words on the current record, but I believe absolute resolution is unnecessary, as discussed below.

 The hydrogeological peer review committee was not shown the Barosh report, which had been submitted at the end of the public comment period.

 The report was drafted by Mike Rapacz, an employee of the Department, but by its terms it represents the opinions, conclusions and recommendations of the hydrogeology peer review committee.

 General Laws c. Ill, §150A provides in relevant part:
No facility shall be established, constructed, expanded, maintained, [or] operated . . . unless detailed operating plans, specifications, a public health report, if any, and necessary environmental reports have been submitted to the department and the department has granted a permit for the facility . . . [A]fter the department is satisfied that said operating plans, specifications, and reports are complete, the department shall make a decision granting or refusing to grant such permit. . .
Every decision by the department granting or refusing to grant such permit shall be in writing and shall contain findings with regard to criteria established by the department. Any person aggrieved by the action of the department in granting or refusing to grant such permit, may appeal said decision pursuant to the provisions of [G.L.c. 30A, §14]. For the limited purposes of such an appeal said department action shall be deemed to be a final decision in an adjudicatory proceeding.

 Section 19.035(1) provides as follows:
19.035: Public Hearing. (1) Circumstances Requiring a Public Hearing. The Department shall schedule a public hearing within the community wherein the proposed facility is to be located when:
(c) the Department prepares a modified draft permit with substantial revisions from the original draft permit issued pursuant to 310 CMR 19.034. Copies of the revised draft permit shall be distributed in accordance with 310 CMR 19.032(3).

 Section 19.034(1) provides:
During the public comment period provided for in 330 CMR 19.033(3) any interested person may submit written comments on the draft decision to the office of the Department processing the permit request.

 DEAfurther argues that: (1) the fee and schedule agreement between DEA and the Department obligated the latter to notify DEA when it determined there were “major technical deficiencies” in DEA’s submission: (2) the Department’s conclusions, set forth in the final decision, that DEA’s hydrogeological studies and endangered species studies were inadequate constituted determinations of “major technical deficiencies”; and (3) accordingly, the Department was required to notify DEA of these issues before the final decision was rendered. The Department contends that the fee and schedule agreement provisions applied to issues of timeliness only, and did not require any notification to DEA during the Department’s process of formalizing the final decision in written form. I am more inclined to accept the interpretation of the agreement which the Department offers, but in view of the conclusions I reach on DEA’s due process claims, discussed below, I do not need to resolve this interpretive conflict at present.

 The position that internal staff evaluations of data in the administrative record need not be made available for review and comment by the parties is not universally accepted. See Marathon Oil Co. v. Environmental ProtectionAgency, 564 F.2d 1253, 1271-72 and n.54 (9th Cir. 1974) (remand called for where administrator had staff memorandum analyzing data in agency record, but parties had not been given notice or the chance to comment on the memorandum).

 The permit application proceeding at issue of course was not an adjudicatory proceeding, unlike the cited Massachusetts General Hospital case. However, it seems clear from the fact that G.L.c. 111, §150A calls for judicial review under G.L.c. 30A, §14, that (1) the Department's decision must be based on the formal administrative record, and (2) as is true of adjudicatory proceeding, parties are entitled to notice and an opportunity to comment on the information constituting that record.

 The Department suggests that DEA waived any right to complain about the hydrogeology peer review committee’s work because the Commissioner informed DEA’s president, Vincent Barletta, that he was setting up such a committee and Barletta did not object. (Defts. Mem., p. 94.) As discussed above, the record is cloudy with respect to the interchange between the Commissioner and Barletta concerning Barletta’s opportunity to receive notice of certain “new” developments. (Seep. 5, n.6 supra) Given the lack of clear evidence of waiver on its part, fairness demands rejection of the Department’s suggestion. In short, on the record before me, I cannot conclude that DEA waived its right to complain about the Department’s use of the hydrogeology peer review committee and the committee’s conclusions in the Department’s final decision. Compare Norway Cafe, Inc. v. Alcoholic Beverages Control Comm'n, 7 Mass.App.Ct. 37, 38-40 (1979).
I do not suggest here that the Department lacks authority to establish a group such as the hydrogeology peer review committee or that it cannot rely on recommendations and advice given by such a committee. The point is simply the right of parties to the administrative proceeding to have notice of such a committee’s recommendation and an opportunity to respond.

 I cannot accept the Department’s suggestion that DEA already has a full opportunity to respond to the peer review reports, as well as all other submissions filed in the public comment period, insofar as the Department’s decision leaves open to DEA the option of submitting a new permit application. (Decision, p. 2.) DEA had spent seven years involved in the overall permitting process by the time the Department issued its final decision, and well over a year in the final construction permit phase. DEA had also negotiated and paid to the Department a fee of $52,065 to cover this phase. The Department would essentially require DEA to go back to square one of the construction permit process and, presumably, renegotiate and pay a new administrative fee. In light of the Department’s errors, DEA has a right to continue in the same administrative review process, and to have the Department reopen them for the purpose of allowing further comment and submissions on the hydrogeology and endangered species issues.

 While I have not resolved any of the disputes between the Department and DEA about the substance of the *412 Department’s decision — was it based on substantial evidence and otherwise not tainted by error of law — my review of DEA’s memorandum and portions of the record does suggest that DEA has raised challenges to the Department’s substantive conclusions about the bedrock features and the site’s monitorability which deserve attention.

 DEA has raised a number of other claimed procedural errors in addition to those discussed here. I do not reach them, because even if one or more is valid, the order of remand should provide DEA with an adequate remedy.